1

2                      **UNITED STATES DISTRICT COURT**

3                          **DISTRICT OF OREGON**

4                          **PORTLAND DIVISION**

5

6  ROMONDO LOVELESS,                      )
                                          )
7                  Plaintiff,             )     No. 03:10-cv-00892-HU
                                          )
8  vs.                                    )
                                          )
9  MICHAEL J. ASTRUE,                     )  **FINDINGS AND RECOMMENDATION**
   Commissioner of Social Security,       )
10                                        )
                   Defendant.             )
11

12          _____

13

14 Max Rae
   P.O. Box 7790
15 Salem, OR 97303

16      Attorney for Plaintiff

17

18 S. Amanda Marshall
   United States Attorney
19 Adrian L. Brown
   Assistant United States Attorney
20 1000 S.W. Third Avenue, Suite 600
   Portland, OR 97204-2904
21

22 Matthew W. Pile
   Special Assistant United States Attorney
23 Social Security Administration
   Office of the General Counsel
24 701 Fifth Avenue, Suite 2900 M/S 221A
   Seattle, WA 98104-7075
25

       Attorneys for Defendant
26

27

28

1 - FINDINGS & RECOMMENDATION

1                *TABLE OF CONTENTS*

2  I.    PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . 3

3  II.  FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . 5

4        A.    Summary of the Documentary Evidence. . . . . . . . . 5

5               1.   Physical health history. . . . . . . . . . . 5

6               2.   Mental health history. . . . . . . . . . . 13

7        B.    Medical Expert's Testimony. . . . . . . . . . . . 24

8        C.    Vocational Expert's Testimony. . . . . . . . . . . 27

9        D.    Loveless's Testimony. . . . . . . . . . . . . . . 30

10              1.   Hearing testimony. . . . . . . . . . . . . 30

11              2.   Written testimony. . . . . . . . . . . . . 36

12        E.    Third-Party Testimony. . . . . . . . . . . . . . . 38

13              1.   Amber Breeze Wilson. . . . . . . . . . . . 38

14              2.   Jacqui M. Berger. . . . . . . . . . . . . 39

15  III. DISABILITY DETERMINATION AND THE BURDEN OF PROOF. . . . 40

16        A.    Legal Standards. . . . . . . . . . . . . . . . . 40

17        B.    The ALJ's Decision. . . . . . . . . . . . . . . 43

18  IV.  STANDARD OF REVIEW. . . . . . . . . . . . . . . . . 47

19  V.   DISCUSSION. . . . . . . . . . . . . . . . . . . . . 48

20        A.    Substantial Gainful Activity. . . . . . . . . . . 48

21        B.    Evaluation of Listed Impairments. . . . . . . . . 50

22              1.   Activities of daily living. . . . . . . . . 53

23              2.   Social functioning. . . . . . . . . . . . 55

24              3.   Concentration, persistence, or pace. . . . . 57

25              4.   Listing 12.05(C). . . . . . . . . . . . . 59

26        C.    Evaluation of Third-Party Testimony. . . . . . . . 64

27        D.    Improper Legal Standard. . . . . . . . . . . . . 65

28        E.    Residual Functional Capacity. . . . . . . . . . . 66

F.   Loveless's Ability to Work. . . . . . . . . . 66

G.   Step Five Burden. . . . . . . . . . . . . . 69

VI.  CONCLUSION. . . . . . . . . . . . . . . . . . . . 69

VII. SCHEDULING ORDER. . . . . . . . . . . . . . . . . 70

*   *   *   *   *

HUBEL, United States Magistrate Judge:

The plaintiff Romondo Loveless seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying his applications for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act. Loveless argues the Administrative Law Judge ("ALJ") erred in numerous respects, ultimately resulting in the conclusion that Loveless is not disabled. *See* Dkt. ##15 & 17.

### I.   PROCEDURAL BACKGROUND

Loveless protectively filed applications for DI and SSI benefits on December 16, 2004, claiming he has been disabled since his birth on July 20, 1982.[1] (A.R. 23, 93-97, 414-16[2]) Loveless

_____

[1]*But see* the discussion at A.R. 477-78, and the ALJ's comment that, as "a matter of common sense," birth is not an appropriate alleged onset date. (A.R. 478)

[2]The administrative record was filed electronically using the court's CM/ECF system. Dkt. #11 and attachments. Pages of the record contain three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #11-1,
(continued...)

3 - FINDINGS & RECOMMENDATION

1  claims he is disabled due to back and leg pain, fatigue, worrying,
2  weakness; dyslexia, learning difficulties, and comprehension
3  problems; memory problems; anger; and paranoia. (A.R. 121, 170,
4  191, 223, & 225)

5      Loveless's applications were denied initially and on recon-
6  sideration. (A.R. 79-84, 86-88, 417-26) He requested a hearing
7  (A.R. 89), and a hearing was held on June 5, 2008, before an ALJ.
8  (A.R. 467-99) Loveless was represented by an attorney at the
9  hearing. (*See* A.R. 467) Loveless testified at the hearing, and a
10 Medical Expert ("ME") also testified. (*Id.*) A second hearing was
11 held on June 22, 2008 (A.R. 500-83), and Loveless again was
12 represented by counsel. Loveless and the ME testified again, and
13 testimony also was provided by a Vocational Expert ("VE"), and by
14 Loveless's sister. (*Id.*) On September 23, 2008, the ALJ issued
15 her decision, finding Loveless could perform his past relevant work
16 as a yard worker and kitchen helper, and he therefore is not
17 disabled. (A.R. 23-34) Loveless appealed the ALJ's decision, and
18 on June 10, 2010, the Appeals Council denied his request for review
19 (A.R. 6-10), making the ALJ's decision the final decision of the
20 Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

21     Loveless filed a timely Complaint in this court, seeking
22 judicial review of the Commissioner's final decision. Dkt. #2.
23 The matter now is fully briefed, and I submit the following
24 Findings and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

25

26     [2](...continued)
   Page 83 of 231), and a Page ID#; and one located at the upper right
27 corner of the page, representing the numbering inserted by the
   Agency. Citations herein to "A.R." refer to the agency numbering
28 in the upper right corner of each page.

4 - FINDINGS & RECOMMENDATION

## II.  FACTUAL BACKGROUND

### A.  Summary of the Documentary Evidence

### 1.  Physical health history

Loveless saw a doctor on July 18, 2001, with complaints of a sore throat, earache, headache, and low-grade fever.  Notes indicate he was "a nonsmoker" (A.R. 303), but this conflicts with other evidence in the record, as noted later in this opinion.  He was diagnosed with otitis media and an upper respiratory infection, and an antibiotic was prescribed.  (*Id.*)

He next saw a doctor on September 14, 2001, due to "ongoing symptoms of fatigue, cough, and loss of appetite."  (*Id.*) Laboratory analysis of blood drawn the previous day showed an elevated white blood cell count, and negative monospot.  He was diagnosed with suspected mycoplasma (a/k/a "walking pneumonia"), and a seven-day course of doxycycline was prescribed.  (*Id.*)

On October 15, 2001, x-rays were taken of Loveless's right hand after he reportedly "[p]unched a wall."  (A.R. 312)  The x-rays showed no new fractures since 04/03/2001.  (*Id.*)

On February 22, 2002, Loveless saw a doctor with complaints of coughing, congestion, and fatigue.  He was diagnosed with bronchitis.  He received prescriptions for an antibiotic and a smoking-cessation medication.  (A.R. 302)  He returned for followup on March 27, 2002, complaining that he was having difficulty stopping smoking.  The Zyban caused him to "feel jumpy and uptight," which actually caused him to smoke more.  He, his wife, and their infant daughter were living in a hotel after being kicked out of his in-laws' home.  He was "working for his grandmother" at an unspecified job, "making a little bit of money but . . . feeling overwhelmed."

5 - FINDINGS & RECOMMENDATION

1  (*Id.*)  He was switched from Zyban to a nicotine patch, and he was

2  started on Celexa, an antidepressant.   He also was started on

3  tetracycline for acne. (A.R. 301)

4       Loveless saw a doctor on October 4, 2002, for followup of his

5  "depression and methamphetamine abuse." (A.R. 301)  He was taking

6  Celexa 20 mg/daily and tetracycline.  He stated the Celexa helped

7  "sometimes," but he still found it difficult to avoid using drugs

8  because they were "so prevalent and accessible." (*Id.*)  He wanted

9  to get into drug treatment and also asked to see a psychiatrist.

10 He reported some improvement in his sleep, but he still felt

11 depressed and anxious, and he reported having panic attacks in the

12 evening.  Loveless gave a history of methamphetamine use since age

13 nine.  He described a transient lifestyle and stated he came from

14 a "very broken home upbringing." (A.R. 301-300)  He was encouraged

15 to enter a drug treatment program, and was referred to the County

16 mental health department.  (A.R. 300)

17      An "emergency  urine  drug  scr[ee]n"  was  performed  on

18 October 23, 2002.  The test was positive for benzodiazepines, and

19 negative for opiates, cannabinoids, cocaine metabolites, metham-

20 phetamine, tricyclics, amphetamines, barbiturates, and PCP. (A.R.

21 310)  A basic metabolic panel and blood counts were normal. (*Id.*)

22      Loveless saw a doctor for followup on October 30, 2002.  He

23 complained that the Celexa was affecting his hearing and vision,

24 and he was switched from Celexa to Paxil.  He also received a

25 prescription for Klonopin, for panic attacks.  (*Id.*)

26      On November 19, 2002, Loveless saw a doctor complaining of

27 neck pain, nausea, dizziness, and "hot/cold flashes" following a

28 fall the night before.  He stated he had slipped and fallen while

6 - FINDINGS & RECOMMENDATION

1   leaving his house, hitting his head on a lower step and suffering
2   a concussion with "presumed loss of consciousness." (A.R. 299)
3   Notes indicate Loveless had "a history of chronic methamphetamine
4   use but [said] that he ha[d] been clean for a while." (*Id.*) He
5   complained of pain and some light sensitivity. He had good ranges
6   of motion and his neurological exam was normal, although he did
7   exhibit some pain when he moved. X-rays of his cervical spine also
8   were normal. (A.R. 313) He was diagnosed with a concussion,
9   "possible grade 2," and was advised to have his wife observe him
10  closely and perform frequent neurological checks until the next
11  day, when Loveless was told to call with a status report.
12  (A.R. 299) On November 21, 2002, a CT study was done of Loveless's
13  head to follow up on his head trauma. The study was negative.
14  (A.R. 314)

15      On November 25, 2002, Loveless saw a doctor complaining of a
16  "severe sore throat" of three days' duration. He was diagnosed
17  with pharyngitis, and was told to drink fluids and take Ibuprofen
18  as needed. (A.R. 298)

19      On November 26 and 27, 2002, Loveless saw a doctor for
20  treatment of a rash around his midsection. Prednisone and an
21  antibiotic were prescribed. (A.R. 296-97) He missed several
22  scheduled appointments in a row in December 2002 and January 2003.
23  (A.R. 296)

24      Loveless saw a doctor on February 7, 2003, complaining of
25  "problems associated with dental caries[.]" (A.R. 295) The doctor
26  prescribed an anti-bacterial medication, and Naprosyn as needed for
27  pain, and noted Loveless was going to see a dentist "within the
28  month." (*Id.*)

7 - FINDINGS & RECOMMENDATION

1    A liver function panel on February 24, 2003, was abnormal,
2 with elevated liver enzyme levels.  (A.R. 312)

3    On March 25, 2003, Loveless saw a doctor for treatment of a
4 urinary tract infection.   He was treated with antibiotics.
5 (A.R. 295)

6    On April 5, 2003, x-rays were taken of Loveless's right ankle
7 when he presented to the emergency room with ankle pain.   The x-
8 rays showed "no evidence of acute fracture or dislocation.   Soft
9 tissue swelling [was] noted."  (A.R. 315)

10    On August 23, 2004, Loveless saw family practitioner Jeanne
11 Fitzpatrick, M.D. at the Aumsville Medical Clinic to establish as
12 a new patient.   Loveless had a fungal rash on his trunk, which he
13 stated had been spreading rapidly for a few months.   He also had
14 Athlete's foot on both feet. He was given a prescription for Zyban
15 to assist in smoking cessation.   Ketoconazole (an anti-fungal) was
16 prescribed for the rash.   He also noted he had been on Paxil
17 previously, but had run out, and that prescription was renewed.
18 (A.R. 351)   Loveless also reported a history of methamphetamine
19 abuse from age nine until three months earlier.   The doctor noted
20 Loveless's demeanor was "rather disconnected and [he] very possibly
21 [was] high."  (*Id.*)

22    On September 3, 2004, Loveless saw Dr. Fitzpatrick complaining
23 of insomnia.   In addition, he requested "a letter of disability."
24 (A.R. 350)   The doctor prescribed a trial of amitriptyline at
25 bedtime for the insomnia.  (*Id.*)  Regarding Loveless's request for
26 a disability letter, Dr. Fitzpatrick noted: "Patient states he is
27 disabled because he can't read or write.   He admits that he could
28 do either landscaping work or construction."  (*Id.*)   The doctor

8 - FINDINGS & RECOMMENDATION

1  asked Loveless to obtain records "from his previous mental health
2  worker who has determined in the past that he is mentally disabled
3  to work." (*Id.*)

4      On October 6, 2004, Scott Hadden, M.D. of the Aumsville clinic
5  completed a Functional Limits Assessment form at the request of the
6  state agency, in connection with Loveless's request to participate
7  in a JOBS program.  Dr. Hadden noted Loveless's prognosis to be
8  "Good" regarding his hepatitis C, depression, and substance abuse.
9  He indicated Loveless could work full time with no restrictions,
10 and he would be an appropriate candidate for vocational rehabili-
11 tation.  (A.R. 363)

12     On December 27, 2004, Loveless saw family practitioner Tanie
13 Hotan, M.D. at the Aumsville clinic for complaints of "about 4 days
14 of headache, sore throat, body aches," and "just not feeling well."
15 (A.R. 348)  He was diagnosed with a viral syndrome, and was
16 counseled regarding "supportive and symptomatic treatment." (A.R.
17 348)

18     On January 6, 2005, Loveless saw Dr. Hotan for "multiple
19 symptoms including severe headache." (A.R. 347)  He complained of
20 extreme fatigue and all-over body fatigue.  He noted he had been
21 taking Seroquel for two or three days, and it had improved his
22 paranoia symptoms.  He was diagnosed with chronic fatigue and
23 weakness.  Lab tests were ordered.  He was cautioned not to use any
24 street drugs because they could suppress his energy.  (*Id.*)  Lab
25 results were consistent with a hepatitis C virus infection.  (A.R.
26 355)

27     On January 10, 2005, Loveless saw Dr. Fitzpatrick with
28 complaints of ongoing cold symptoms.  He was treated with over-the-

1  counter cold medications and rest.  He was given a work release for
2  January 6-12, 2005.  (A.R. 346)

3       On February 14, 2005, Dr. Hotan completed a form submitted to
4  her by the state agency for purposes of quantifying Loveless's
5  functional abilities.  (A.R. 342-44; *see* A.R. 345)  Dr. Hotan
6  indicated she had been treating Loveless "for a few visits now."
7  (A.R. 345)  She opined that physically, Loveless was "able to sit,
8  stand, walk, lift, carry, handle objects, hear, speak, and travel";
9  "sustain concentration well"; and he was "socially capable of
10 interacting with the staff [at the medical clinic]."  (*Id.*)  She
11 opined Loveless could lift twenty pounds occasionally and five
12 pounds frequently; walk/stand, with normal breaks, for one to two
13 hours in an eight-hour day; and sit for four hours in an eight-hour
14 day, with normal breaks.  (A.R. 341)  However, Dr. Hotan noted that
15 these restrictions were based on Loveless's subjective complaints,
16 rather than on objective findings.  (*Id.*)

17      On February 5, 2006, Loveless talked by telephone with a nurse
18 at Kaiser Foundation Health Plan ("Kaiser") regarding treatment for
19 a puncture wound he had sustained after stepping on a nail.    He
20 was instructed in the care of the puncture wound.  (A.R. 386)

21      On April 2, 2005, Loveless underwent a consultative evaluation
22 by Crystal North, D.O. for complaints of "Hepatitis C" and "Back
23 and leg pain."   (A.R. 327; *see* A.R. 332-33)   Regarding his
24 Hepatitis C, Loveless gave the following history:

25              The claimant stated he was diagnosed in 2002
                when he presented to his primary care
26              physician with increasing fatigue and overall
                body aches.  He was told his liver enzymes
27              have been intermittently increased, but a
                biopsy will not be done until his psychiatric
28              Disability evaluation is complete. [Loveless]

10 - FINDINGS & RECOMMENDATION

1            stated he used to use intravenous methampheta-
           mines, and this is likely how he contracted
2            hepatitis C.  He has not used drugs for one
           year and does not use alcohol. Nothing [he]
3            does relieves his overall body aches, and he
           does have exacerbation of this, but he denied
4            any joint swelling.  He does have a rash that
           has been present intermittently since his
5            diagnosis of hepatitis C.

6 (*Id.*)

7     Regarding his back and leg pain, Loveless stated the pain
8 started after he jumped off a two-story building at age seven.  An
9 MRI and CT scan in the past had shown no etiology for his pain.  He
10 described the pain as "pressure-like," starting in his hips and
11 traveling down both legs to his ankles.  Loveless stated he had
12 injured his back two months earlier "by picking up a desk," but he
13 had not been evaluated since that injury.  He stated his pain was
14 present all day.  Lying down helped the pain somewhat, and he was
15 not taking any pain medications.  He had been "working 30-65 hours
16 every two weeks at a gas station," but stated he needed to reduce
17 those hours due to his back pain.  (A.R. 328)

18     Regarding his activities of daily living, Loveless indicated
19 he could do most housework, cook, and "walk up stairs with minimal
20 pain."  (*Id.*)  He avoided grocery shopping, stating he could not
21 "do the math work."  He did not have a driver's license and did not
22 drive.  He "enjoy[ed] taking care of his horses."  (*Id.*)

23     Dr. North observed that Loveless had no difficulty walking,
24 sitting, removing his boots, or moving about the examination room.
25 Loveless's physical examination was normal, with the only remark-
26 able finding being a "macular rash extending from his chest to his
27 abdomen and also on bilateral arms, most confluent in the upper arm
28 region," with "small, well-circumscribed macular lesions that

11 - FINDINGS & RECOMMENDATION

1  [were] non-raised, but slightly scaling on both forearms." (A.R.
2  329)

3      From her examination, Dr. North concluded Loveless should be
4  able to stand and walk for a full eight-hour workday without
5  restrictions with breaks every two hours; sit for a full eight-hour
6  workday without restrictions; and lift and carry up to 25 pounds
7  frequently and 50 pounds occasionally.  She noted that lifting
8  might exacerbate Loveless's back pain, although she found no
9  objective evidence to support such a conclusion.  She found
10 Loveless to have no postural, manipulative, or "relevant visual
11 limitations." (A.R. 331)  She noted Loveless might experience
12 "generalized muscle aches and [the] body rash secondary to his
13 hepatitis C," but she did not find him to have "any actual physical
14 limitations." (*Id.*)

15     On May 11, 2006, Loveless saw a physician's assistant with
16 complaints of sinus pressure, stuffy nose, and cough.  He was
17 diagnosed with acute sinusitis, and was treated with Amoxicillin
18 and Naproxen.  He also was given refills of Seroquel, Paxil, and
19 Trazodone. (A.R. 381)

20     On June 7, 2006, Loveless called Kaiser to request an urgent
21 appointment for several problems.  He stated he had "been doing
22 some heavy work and his back [was] hurting." (A.R. 380)  He also
23 reported shoulder pain, and a rash on his right hand. (*Id.*)  The
24 next day, Loveless saw John C. Klement, M.D. at Kaiser with
25 complaints of a rash, back pain, and left shoulder/arm pain with a
26 tingling sensation.  He was diagnosed with dermatitis, low back
27 pain, cervicalgia, and depression.  Loveless asked to try a differ-
28 ent antidepressant medication, and he was switched to Zoloft.

12 - FINDINGS & RECOMMENDATION

1  Naproxen and chiropractic care were prescribed for his pain
2  symptoms.  A cream was prescribed for the rash.  (A.R. 377-78)

3      Loveless saw a physician's assistant at Kaiser on October 11,
4  2006, with complaints of general malaise and fatigue, with some GI
5  symptoms.  He was diagnosed with a "viral syndrome."  (A.R. 371-72)
6  Lab tests in October 2006 continued to be positive for hepatitis C.
7  (A.R. 370)

8

9  *2.   Mental health history*

10     On March 29, 2002, when Loveless was nineteen years old, he
11 underwent a psychological evaluation by school psychologist Jay T.
12 Davis, Ed.D., on referral from "the Adult and Family Services
13 agency based in Salem, Oregon, as part of the Learning Disability
14 Assessment project."  (A.R. 288-92)  Loveless was suspected of
15 having a learning disability, and the doctor's report indicates
16 Loveless "received specialized help when he attended public school
17 through eighth grade."  (*Id.*)  The doctor indicated Loveless
18 "showed good focus on-task and good persistence throughout the
19 testing session, [but] often worked well beyond the time limits
20 allotted.  He showed a high rate of errors, however, when doing
21 rote, pencil-and-paper tasks."  (A.R. 289)

22     Loveless's scores on the WAIS-III indicated Loveless has a
23 verbal IQ of 78, performance IQ of 74, and full-scale IQ of 74,
24 which placed him "in the Borderline range."  (*Id.*)  His Processing
25 Speed score of 66 was in the Deficient range.  (A.R. 290)
26 Dr. Davis administered the Woodcock-Johnson Psycho-Educational
27 Battery, which measures "reading decoding, math calculation, and
28 spelling."  (A.R. 291)  Loveless's test scores "appeared generally

13 - FINDINGS & RECOMMENDATION

at about the third-to-fourth grade levels.  His penmanship was quite poor, and the examiner had to ask him numerous times for clarification of the letters he had written.  A relative strength was seen on the applied Problems subtest, on which [he] scored at the sixth grade level." (*Id.*)

Dr. Davis noted Loveless "presented as personable and motivated to improve his skills to further his employability." (*Id.*) He did not find Loveless to have a learning disability.  He noted Loveless's "overall IQ approaches, but does not meet, the range commonly associated with mental retardation," although he further noted that additional information, such as measures of adaptive functioning, could indicate Loveless would fit the eligibility category for mental retardation.  (A.R. 292)

Dr. Davis recommended Loveless receive an updated audiological examination, noting it was unclear the extent to which his "reported difficulty hearing might interfere with his ability to function in a work or school setting." (*Id.*)  He recommended Loveless use a word processor or printer to compensate for his poor penmanship.  He noted that because Loveless "has had some success in working in jobs where he works with the public, as well as working with a cash register, these seem like viable possibilities for him to consider in the near term." (*Id.*)  He recommended Loveless take actions to prevent the possibility of relapse in his use of drugs.  He concluded Loveless appeared to need "consultation . . . with staff knowledgeable about available resources that can support his need for housing and transportation.  [Loveless] may benefit from instruction and guidance regarding use of public transportation." (*Id.*)

1    On February 7, 2003, Loveless saw a doctor complaining of
2  "worsening anxiety" that was not responding to treatment with
3  Paxil. (A.R. 295) He was switched to Effexor XR, with the dosage
4  to be tapered upward after one week. (*Id.*)

5    On September 19, 2003, Loveless underwent a mental status
6  assessment by Robert A. Kruger, Psy.D., at the request of the
7  Social Security Administration. (A.R. 320-25) When asked what had
8  led to his application for disability benefits, Loveless stated:

9             "It's because my symptoms seem to be wor-
             sening. It's my legs and my back. When I sit
10            too long, it hurts to get up.  When I was
             seven years old, I jumped off a two-story roof
11            and hurt myself. After that, I couldn't stand
             up for a while, but I didn't have any surgery.
12            I also have emotional problems.  I just don't
             do too well.  I just got on some medication
13            [Risperdal] two days ago. They put me on that
             medication because I get angry all of a sudden
14            and I get paranoid around my environment.
             Sometimes I feel like everybody's out to get
15            me.  I've felt that way for about two years."

16  (A.R. 320) Loveless stated he had tried Effexor, Paxil, and Xanax
17  in the past.

18    Loveless stated he had quit school at the eighth grade because
19  he was unable to do the work. He stated, "Nothing was easy for me,
20  and I didn't get the kind of help I felt that I needed." (*Id.*)
21  During school, he was in some mainstream classes and some special
22  education classes. (*Id.*)

23    Loveless gave a history of a somewhat transient lifestyle
24  after he left school at age fourteen, with some criminal activity,
25  and a history of illicit drug use from age nine, with almost daily
26  use of methamphetamine from age thirteen until he got clean on
27  July 20, 2003. (A.R. 320-22) He had tried drug treatment programs
28  in the past without success, but at the time of this interview, he

15 - FINDINGS & RECOMMENDATION

1   had been participating actively in a drug treatment program at

2   "Bridgeway." (A.R. 322)

3        He described a sparse work history, including work at "the

4   Skate Palace" for a month before being fired due to drug use, and

5   three days' work at McDonald's, which he left after becoming ill.

6   However, he noted he had not liked working at McDonald's "because

7   when you cooked you would get burned, and standing hurt my legs too

8   much." (A.R. 321)  He work on a fish-processing boat in Cold Bay,

9   Alaska, for three months, but stated the job required him to "stay

10  up for three days" when the fish came in, and he did not want to do

11  that. (*Id.*)  He stated his most recent job was a two-week stint at

12  the Oregon State Fair, "a seasonal position." (*Id.*)

13       Loveless described his typical day as follows:

14            [H]e gets up at 8:00 a.m.  He remarked, "I
             take a shower, get myself dressed, and meet up
15            with my girlfriend.  I might go over to her
             apartment.  As the day goes on, we do what-
16            ever.  Sometimes I meet with some church
             people.  I've got a pastor who's 90 years old.
17            I see him on Monday, and I see another
             preacher on Wednesday.  On Thursday and
18            Sunday, I go to church."  When questioned
             about his activities subsequent to the evening
19            meal, [he] remarked, "I pretty  much stay on
             the couch and watch TV."  He reported that he
20            generally retires for the night between 8:00
             p.m. and midnight, and he described his
21            overall sleep pattern as "not too good."  He
             added, "I end up waking up two or three times
22            a night."

23            When questioned as to some of the activities
             that he is involved in on weekends, [he]
24            remarked, "If me and my fiancé [sic] get time
             to get away from the kids, we might get
25            together and watch TV alone, maybe go to
             movies, and go to church."

26

27  (*Id.*)  Loveless stated he and his fiancée had been together for

28  about five years, and they had two children together, but they had

16 - FINDINGS & RECOMMENDATION

"always had difficulty communicating." (*Id.*)  Their activities included taking their children skating, to the zoo, and to parks. (*Id.*)

Loveless was able to manage his own self-care, prepare simple meals, manage his hygiene, perform household tasks as necessary, make small store purchases without assistance and handle simple monetary transactions, use public transportation, and use a telephone.  (A.R. 322)

Dr. Kruger did not administer any formal tests, but he was able to assess Loveless's mental status, and overall attention and concentration abilities, from his interview and from informal tests such as having Loveless repeat the alphabet, recall various events and data, repeat days of the week, etc.  (*See* A.R. 323-24) Loveless was able to maintain his attention fairly well "on brief, basic, routine, repetitive tasks," and he performed fairly well on tasks involving memory and repetition.  He evidenced a poor fund of general information, and fair abstract reasoning ability.  Overall, Dr. Kruger concluded Loveless would be able to perform brief, basic, repetitive tasks "adequately, within an appropriate period of time."  (A.R. 324)  Dr. Kruger also opined Loveless would be able to manage his own money appropriately should he be awarded benefits.  (*Id.*)  Although Loveless appeared to have had a sub-stance-induced psychosis in the past, Dr. Kruger did not observe Loveless to demonstrate any overt psychiatric symptoms reflective of any psychotic or anxiety-related disorder.  However, he noted Loveless had described "symptoms and behaviors [that were] reflective of a mild depressive disorder, including . . . sadness much of the day, personal disappointment, irritability, difficulty

17 - FINDINGS & RECOMMENDATION

making decisions, and a loss of interest in activities that he once was involved in." (*Id.*)

Dr. Kruger's diagnostic impressions of Loveless included "Amphetamine dependence, in early, full remission"; "Depressive disorder [not otherwise specified]"; and "Borderline intellectual functioning vs. low-average range." (*Id.*)  He assessed Loveless's current GAF at 67, and his past GAF at 52.[3]  (*Id.*)

On October 30, 2003, clinical psychologist Bill Hennings, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form (A.R. 253-56), and a Psychiatric Review Technique form (A.R. 257-74).  He evaluated Loveless under Listing 12.02, Organic Mental Disorders, noting Loveless has a possible medically-determinable impairment of Borderline Intellectual Functioning "vs. low average range" (A.R. 258; *see* A.R. 257); an Affective Disorder under Listing 12.04, consisting of a Depressive Disorder not-otherwise specified (A.R. 260); and a substance abuse disorder under Listing 12.09, consisting of "Amphetamine dependence in early full remission" (A.R. 265).  He opined Loveless would have mild limitations in the

---

[3]"Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient.  The scale does not evaluate impairments caused by psychological or environmental factors.  A GAF between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Morgan v. Comm'r*, 169 F.3d 595, 598 n.1 (9th Cir. 1999).  A GAF of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful inter-personal relationships."  The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

18 - FINDINGS & RECOMMENDATION

areas of activities of daily living and maintaining social functioning, and moderate limitation in the ability to maintain concentration, persistence, or pace. He found Loveless to have no extended episodes of decompensation. (A.R. 267) He found the evidence did not establish the presence of the "C" criteria. (A.R. 268; *see* discussions of the Listing criteria, *infra*) From his review of the record evidence, Dr. Hennings concluded Loveless would be capable of performing short, simple, routine tasks with "some limitations in public contact." (A.R. 271; *see* A.R. 270-71)

On December 22, 2004, Loveless saw Dr. Hotan complaining of "multiple issues," and Dr. Hotan asked him to select one to work on first. Loveless chose to work on his insomnia, which he stated was an ongoing problem. He had lost his mental health coverage, so he was no longer taking Paxil. He stated he was restless, staying up until 3:00 a.m.; he had periods where he was "hyper, hot and irritable," lasting three to four hours; and he had periods where he slept for 24 to 48 hours at a time. He also stated he was paranoid and had visual hallucinations. (A.R. 349)

Dr. Hotan noted Loveless had a blunted affect and "mild psychomotor retardation." (*Id.*) He was diagnosed with "[d]epression with cyclic bipolar symptoms." (*Id.*) Dr. Hotan wanted to refer Loveless to a mental health specialist, but Loveless had no insurance and could not afford it. He was prescribed a trial of Seroquel. (*Id.*) A drug screen on December 23, 2004, was negative for the presence of methamphetamine and other drugs. (A.R. 360)

On February 14, 2005, Dr. Hotan completed a Mental Status Report form submitted to her by the state agency. (A.R. 342-44; *see* A.R. 345) Dr. Hotan indicated Loveless was being treated "for

19 - FINDINGS & RECOMMENDATION

mental health issues," with a guarded prognosis. (*Id.*) Loveless
was taking Paxil, Trazodone, and Seroquel, but after several weeks
of treatment, he had shown no improvement. (A.R. 343, 345) The
doctor's diagnostic impressions of Loveless included "depression -
poorly controlled," "visual and auditory hallucinations - poorly
controlled," and "chronic back pain." (A.R. 343) She listed
Loveless's activities of daily living as caring for three- and
four-year-old kids, taking them to the park on nice days, and
cooking for them. She noted Loveless went to church, but he did
not drive due to a revoked or suspended license. Loveless could
read a newspaper but had problems comprehending what he read.
(A.R. 344)

During Loveless's consultative examination by Crystal North,
D.O. on April 2, 2005, Loveless listed a past medical history
including bipolar disorder, and "[p]ossible schizophrenia,
(currently undergoing workup). He stated he has been suffering
symptoms for 2-3 years." (A.R. 328) He complained of auditory and
visual hallucinations, stating the "voices occasionally [told] him
to hurt someone else, although he [was] able to suppress these
feelings." (A.R. 328) Dr. North noted that during Loveless's
physical examination, he "require[d] continual redirection." (A.R.
331) He was "alert and oriented and seem[ed] appropriate,"
although he was noted to be "somewhat slow in answering and [spoke]
in very simple sentences." (*Id.*)

Dr. North expressed concern over Loveless's visual and
auditory hallucinations, and recommended a further psychiatric
workup. Functionally, she opined Loveless "does have communicative

20 - FINDINGS & RECOMMENDATION

1  and workplace environmental limitations, given his probable
2  psychiatric illness." (A.R. 331)

3        On May 18, 2005, clinical psychologist Peter LeBray, Ph.D.
4  reviewed the record and completed a Psychiatric Review Technique
5  form for the period from November 6, 2003, through May 18, 2005.
6  (A.R. 272-82[4])  Dr. LeBray indicated Loveless has a possible
7  impairment due to "Bipolar/Mood" disorder (A.R. 275), and an
8  Organic Mental Disorder consisting of "Learning Disabilities" (A.R.
9  273).  Dr. LeBray found the record contained insufficient evidence
10 for him to form an opinion about the degree of Loveless's
11 functional limitations under the "B" or "C" criteria of the
12 Listings. (A.R. 282-83)  (*See* discussions of the "B" and "C"
13 criteria, *infra*)  He noted Loveless had failed twice to attend an
14 "IQ CE" (presumably a mental status consultative evaluation), once
15 on March 9, 2005, and again on April 25, 2005.  (A.R. 284)

16       On March 1, 2008, Dr. Kruger saw Loveless for a neuropsycho-
17 logical screening examination and repeat mental status assessment.
18 (A.R. 401-08)  Dr. Kruger reviewed Loveless's medical records from
19 2002 forward.   He administered the Wechsler Adult Intelligence
20 Scale - Third Edition (WAIS-III) test, the Test of Memory
21 Malingering (TOMM), and several other tests.  In addition, he asked
22 Loveless to complete the MMPI-2, but Loveless stated he had taken
23 the test two or three times before, and he did not want to take it
24 again.  "With encouragement," he did start the test, but left the
25 office after about twenty minutes before completing it. (A.R. 401)
26 In Loveless's hearing testimony, he indicated he stopped the test

27 ─────────────

28       [4]Pages 272-75 of the record are out of order in the official
   transcript, appearing in reverse order.

because he was "having one of [his] hard days," when he has difficulty comprehending and functioning properly.  He stated he tried to read the test but he was "mixing everything up" and frustrated.  His girlfriend came in to help him read, but he "just couldn't take it."  (A.R. 484)  Loveless left, had something to eat, and then tried to return to the test, but he still was not feeling well, so he left Dr. Kruger a note stating he was unable to complete the test at that time.  (*Id.*)

Loveless described his activities of daily living and independence, providing "evidence that he is able to manage his self-care skills, such as feeding himself, preparing simple foods, dressing himself, and managing his hygiene on a routine basis, adequately and independently."  (A.R. 403)  He indicated his girlfriend, with whom he lived, did most of the household tasks. With regard to finances, Loveless "provided evidence that he is mathematically, intellectually, and emotionally competent in understanding the simple exchange of money and making various small purchases at stores without any difficulty."  (A.R. 404) Dr. Kruger concluded that Loveless was "intellectually and psychologically capable of performing his needed [activities of daily living] adequately on a routine basis, given his current socioeconomic status and lifestyle."  (*Id.*)

Dr. Kruger's diagnostic impressions included depressive disorder not-otherwise-specified, and borderline intellectual functioning.  Intellectually, Loveless was "seen as functioning within the borderline range," with "no significant difference between his verbal and performance scores."  (A.R. 407)  These results were noted to be consistent with testing administered by

Dr. Jay Davis on March 29, 2003, which also placed Loveless in the borderline range. Loveless was noted to be "cooperative, pleasant, mild mannered, at times mildly subdued in his overall mood disposition, functioning within the borderline range of intelligence, having fair memory components, commensurate with his overall intrinsic abilities, and no difficulty tracking . . . content and responding appropriately and adequately." (*Id.*) Dr. Kruger noted:

> Mr. Loveless's overall attention ability and capability of sustaining his attention on brief, basic, routine, repetitive tasks were seen as fair, such that he would be able to complete those tasks adequately, within an appropriate period of time. However, if he were required to add details to his already-learned tasks, and if those details were anything other than basic and repetitive, he would have difficulty completing those tasks within an appropriate period of time on a consistent basis.

(*Id.*)

On June 11, 2008, Dr. Kruger wrote a letter to a disability examiner from the state agency in response to an inquiry about the TOMM test. (A.R. 410-11) He explained the testing process and scoring in detail, and then offered the following regarding Loveless's scores on the test:

> Ms. [sic] Loveless's performance on the TOMM was such that his score was 29 on trial 1, 42 on trial 2, and 44 on the retention trial. These scores are below expectation, raising serious concern about whether Mr. Loveless was putting forth his best effort on the tests. Thus, the reader is to be cautious about interpreting his complaints and difficulties. It is important that, when considering an individual's performance in completing tasks/tests, the psychologist review and consider previous records/information, the individual's

23 - FINDINGS & RECOMMENDATION

1          overall presentation within the interview, and
2          the reasons for the examination.

3  (A.R. 411)

4       On August 16, 2008, Dr. Kruger completed a Medical Source
5  Statement of Ability to do Work-Related Activities (Mental).  He
6  indicated Loveless had marked limitation in the areas of under-
7  standing, remembering, and carrying out complex instructions;
8  moderate limitation in the ability to interact appropriately with
9  supervisors; and mild limitation in the ability to make judgments
10  on simple and complex work-related decisions; interact appropri-
11  ately with the public and co-workers; and respond appropriately to
12  usual work situations and changes in a routine work setting.  (A.R.
13  398-400)

14

15             *B.  Medical Expert's Testimony*

16       Psychologist Larry S. Hart, Ph.D. testified at both of the ALJ
17  hearings.  In the June 5, 2008, hearing, Dr. Hart testified
18  Loveless has severe conditions including a depressive disorder, a
19  substance abuse disorder by history, and borderline intellectual
20  functioning.  (A.R. 481)  He opined Loveless's "restrictions of
21  activity are relatively mild; maintaining social functioning,
22  typically mild; concentration, persistence, and pace seem to be
23  moderate;" and no episodes of decompensation.  (A.R. 491)  He
24  opined Loveless would be able to perform some types of simple tasks
25  or jobs that did not require attention and concentration to
26  complex, detailed work.  He could interact with the public, super-
27  visors, and co-workers, and he should be able to work full time.
28  (A.R. 491-92)

24 - FINDINGS & RECOMMENDATION

1    Regarding Loveless's failure to complete the MMPI at
2  Dr. Kruger's office, the ME noted an eighth grade reading level is
3  required to read the MMPI, which exceeds Loveless's reading level
4  as found by Dr. Davis's testing in 2003.  (A.R. 486)

5    At the second ALJ hearing on July 22, 2008, Dr. Hart testified
6  to some concerns regarding the quality of the evidence of record
7  concerning Loveless's mental health problems.  Loveless's hearing
8  testimony was vague and somewhat confused, and both the ME and the
9  ALJ noted that there seemed to be some medical evidence missing
10 from the record.[5]  The ME noted there were some references in the
11 record indicating Loveless could have a history of bipolar disorder
12 and schizophrenia, but the ME did not believe those diagnoses had
13 been offered by a qualified mental health professional.  (A.R. 540)

14   From the available evidence, the ME did not believe Loveless's
15 conditions equaled any Listed impairment.  (A.R. 541)  Based on
16 Loveless's results on the TOMM test, the ME expressed some concerns
17 about Loveless's "overall test effort and genuineness of response."
18 (*Id.*)  The ME found no problem with Dr. Kruger's administration of
19 the TOMM test and the scoring.  (A.R. 541-42)  He indicated that "a
20 good psychologist is not going to make a definitive statement on
21 malingering as a result of the TOMM itself.  However, the more
22 deviant the claimant's responses are away from a score of 45, that
23 increases the likelihood of probability of malingering or feigning
24 the test effort."  (A.R. 552-53)  He explained that "the TOMM is
25 . . . a cognitive memory test to look at feigning and malingering."
26 (A.R. 552)  In a nutshell, if an examinee performs poorly, "it

27

28   [5]The ALJ also admonished Loveless's counsel for failing to
   obtain all of the available evidence.  (A.R. 540)

25 - FINDINGS & RECOMMENDATION

1  raises suspicions about their test effort, and whether or not that
2  may cloud the overall interpretation of other elements of the
3  mental status exam or other psychological testing." (A.R. 553)

4      The ME opined Loveless is able to perform simple tasks. He
5  noted that Dr. Hotan had indicated, in February 2005, that Loveless
6  was "able to socialize with the medical staff adequately." (A.R.
7  542, referencing A.R. 345)  The ME opined Loveless has mild to
8  moderate social limitations, so he would be able to interact
9  occasionally with others regarding simple tasks. (A.R. 542-43)
10 The ME was unable to provide an opinion regarding Loveless's
11 ability to interact with the public, noting the presence of "some
12 conflicts on . . . that issue" in the record. (A.R. 543)  The ME
13 opined Loveless would be limited to simple tasks and simple issues,
14 noting that habitual tasks involving rote memory would be
15 relatively easy for Loveless. (*Id.*)

16     The ME indicated the record suggests Loveless has had some
17 extended episodes of decompensation that were "drug-influenced over
18 a number of years." (*Id.*)  The ME found the evidence to be "a bit
19 convoluted" on this issue.  He noted Loveless was abstinent for
20 about two years on one occasion, and sporadically for several
21 years, but from the record, it appeared Loveless had an almost
22 continuous period of decompensation during his periods of ongoing
23 use of alcohol and other drugs. (A.R. 543-44)

24     The ME opined Loveless is mildly impaired in terms of the
25 activities of daily living, except that if he is using alcohol or
26 other drugs, then he would be markedly impaired. (A.R. 545)

27     Regarding whether "drug addiction or alcoholism is material to
28 finding disability in this case," the ME stated, "Well, I don't

26 - FINDINGS & RECOMMENDATION

have any question that during periods of time that he's been either alcohol or drug abusive, it's material to his decompensation and inability to work.  He has limited intellectual resources to begin with.  He has a number of other psychiatric problems which are clearly aggravated and worsened by [drug] and [alcohol] issues." (A.R. 546)

Loveless's counsel noted that Dr. Kruger had rated Loveless's I.Q. at "74 verbal, 72 performance, and 70 full-scale."  The ME stated the "confidence interval" for those scores was probably "a couple of points," although they could vary "four or five points . . . either way," with a 95% confidence level.  (A.R. 546-47)  The ME stated an I.Q. score of 69 "usually sets the boundary between borderline intellectual functioning and some measure of retarda-tion."  (A.R. 547)  The ME did not find sufficient evidence in the record to establish the presence of the "C" criteria of Listing 12.05.  (A.R. 545-46)


### C.  Vocational Expert's Testimony

The VE listed the skill levels for Loveless's past work. Service station attendant and amusement park ride operator are semi-skilled jobs.  The remainder of Loveless's jobs are classified as unskilled, including yard worker, kitchen helper, dishwasher, flagger, fast food worker, and cannery worker.  The fast food worker, flagger, and cannery worker jobs require light exertion. Service station attendant has two classifications - light and medium - but the VE indicated the job usually is performed at the light level.  Yard worker and kitchen helper require medium exertion.  (A.R. 564-65)

27 - FINDINGS & RECOMMENDATION

The ALJ asked the VE to consider a person of Loveless's "age, education, and past relevant work experience . . . [who] can lift 50 pounds occasionally, and 25 pounds frequently; can stand and walk two hours at a time, and without limit; and can sit without limit." (A.R. 566)  The VE indicated that all of Loveless's past relevant work would fit within the hypothetical parameters. (*Id.*)  The VE stated the jobs of gas station attendant, yard worker, and kitchen helper all exist in substantial numbers in the national economy. (A.R. 566-67)

The ALJ asked the VE to consider the same hypothetical individual, but with the addition that the individual could only perform "simple tasks involving occasional interaction socially." (A.R. 567)  The VE stated this would "eliminate service station attendant, the amusement park ride operator, [and] fast food worker, from . . . that list." (*Id.*)  However, the individual could still do the yard worker and kitchen helper jobs. (*Id.*)

The ALJ asked the VE to add to the hypothetical "that the person could do tasks involving minimal or moderate amount of judgment, minimal interaction with supervisors, could do work involving occasional to frequent interaction with co-employees and the public, and work involving occasional changes, so it would be basically routine, repetitive . . . work." (A.R. 568)  Loveless's attorney questioned what the ALJ meant by "minimal or moderate amount of judgment."  The VE stated he "would assume a fairly standard level of simplicity in term[s] of the tasks, and a lack of complex or complexity . . . in the tasks, and . . . function." (A.R. 568)  The individual would not have to make judgments regarding, for example, how much food to cook. (*Id.*)  The VE

1  stated that conservatively, such an individual's work would be
2  limited to unskilled jobs.  The kitchen helper, yard worker,
3  flagger, and cannery worker jobs are unskilled and would fit within
4  the hypothetical.  (A.R. 569)

5        The ALJ modified the hypothetical further to include the
6  ability to read and write at only a third or fourth grade level,
7  and to do math at a third to sixth grade level.  The VE stated this
8  individual could perform all of the same jobs as the previous
9  hypothetical individual; i.e., kitchen helper, yard worker,
10 flagger, and cannery worker.  (A.R. 569-70)

11       There was considerable disagreement between Loveless's
12 attorney, the ALJ, and the VE, as to the source of the VE's
13 testimony regarding the level of competence each of these jobs
14 requires.  The VE began to give the competency level in terms of a
15 grade level.  The attorney quoted from the *Dictionary of*
16 *Occupational Titles* ("DOT"), and was unable to locate the grade-
17 level terminology cited by the VE.  The attorney sought to clarify
18 the source of the VE's information, but the ALJ would not allow
19 cross-examination on the subject, indicating she had limited time
20 for the case, and also stating to the attorney, "You may think
21 you're a vocational expert, but I don't."  (A.R. 576; *see* A.R. 570-
22 78)  The attorney asserted "a due process objection," arguing he
23 had "the right to cross-examine th[e] witness, and have her show
24 [him] the source of her information."  (A.R. 577)

25       Upon further questioning by the ALJ, the VE stated the
26 computer program she was using, "OccuBrowse," is based on the DOT.
27 The program is not produced by the United States Government; it is
28 by a private vendor.  The VE stated she had never found the program

29 - FINDINGS & RECOMMENDATION

1  to be "inconsistent with evidence in the DOT regarding the grade
2  equivalencies for these jobs." (A.R. 578-79)

3      Counsel continued to disagree with the VE's testimony, and
4  requested leave to file further information for the ALJ's review.
5  He argued the computer program includes information outside of the
6  DOT, the source of which had not been authenticated.   The ALJ
7  granted counsel leave to submit additional materials within eight
8  days. (A.R. 579-83)

9

10              **D.  *Loveless's Testimony***
11  **1.  *Hearing Testimony***

12      Loveless was born in Salem, Oregon, on July 20, 1982, making
13  him twenty-five years old at the time of the ALJ hearing.  He is
14  5'9" tall, and weighs "150 or 60 pounds." (A.R. 472-73)  He has
15  never had a driver's license.   He left school shortly after
16  beginning the eighth grade.  He can read "a little bit," and has
17  difficulty writing. (A.R. 503-04)  Throughout school, he was not
18  in regular classes, stating he was "in LRC's . . . [and] student
19  helper classes[.]" (A.R. 474)  "LRC" refers to Learning Resource
20  Center, which the ALJ stated is "not quite special ed, is my
21  understanding, but I don't know." (A.R. 475)   To Loveless's
22  recollection, he made Cs and Ds in school. (A.R. 474)  Loveless's
23  attorney noted that Loveless's school records are included in the
24  administrative record. (A.R. 475, referring to A.R. 217-19)

25      Loveless could not recall when he last worked, but his last
26  job was as a gas station attendant. (A.R. 475, 504)  Loveless's
27  attorney stated this job was "for three or four months" during
28  2007, but the record of earnings was not yet in the ALJ's printout.

30 - FINDINGS & RECOMMENDATION

1   (A.R. 504)  Loveless was fired from the job because of attendance

2   problems.  He stated he "would forget [his] schedule."  (A.R. 505)

3   He also worked at another gas-pumping job that he lost due to

4   attendance problems.  (A.R. 506)

5        The ALJ noted the record shows Loveless "worked for K and D

6   Services of Oregon in 2006."  (A.R. 505)  Loveless stated he was a

7   flagger for the company, and he worked for them on two different

8   occasions.  He quit because without a driver's license, he was

9   unable to get to the job consistently.  (A.R. 505-06)

10       The ALJ noted records indicate Loveless earned in excess of

11  $6,500 in 2003.  He worked for "Funtastic Rides," a seasonal job,

12  and he also was self-employed doing yard work at that time.  He did

13  yard work for six months to a year, working with a friend.  The job

14  required him to lift thirty to forty pounds.  (A.R. 475-76, 506-07)

15  According to Loveless, he was fired from the Funtastic Rides job

16  because he could not "remember how to operate the rides anymore."

17  (A.R. 507)  He stated, "I used to be able to do it really easy,

18  because I did it for a couple of years straight.  And now, I can't

19  even do that."  (*Id.*)

20       Loveless stated the amounts shown on his 2002 and 2003 tax

21  returns were estimates because he did not keep records from which

22  his taxes could be prepared.  (A.R. 507-08)  He said he "never had

23  that much money," and he was talking with the IRS about taxes the

24  Government claims he owes for those years.  (A.R. 508)

25       In 2001, Loveless worked at several short-term jobs.  He

26  worked as a floor guard at a roller skating rink.  He lost the job

27  due to a back injury, and he also "had a bad accident with one of

28  the workers there."  (*Id.*)  He emptied trash cans for a janitorial

31 - FINDINGS & RECOMMENDATION

1  service for about a week, losing the job because he "took too long
2  to empty the trash cans." (A.R. 509)  He worked on a fishing boat
3  for three days and then was laid off.  He worked at a McDonald's
4  but was fired because he "[c]ouldn't remember how to do things."
5  (*Id.*)

6      Loveless worked at a cannery, canning mushrooms, for awhile,
7  but he was fired because he could not keep up with the work pace
8  and had difficulty understanding things. (A.R. 510)  In 1998, he
9  worked at Pizza Hut.  He was fired from that job, but could not
10 recall why, stating he had lost all of his jobs. (*Id.*)  He worked
11 at a restaurant for awhile, "either washing dishes or potatoes,"
12 but he was fired because he "didn't do [his] job right." (A.R.
13 511)

14     Loveless stated his girlfriend was supporting him.  She was in
15 school and got student loans and grants. (A.R. 512)  He used to
16 care for his children, but he was convicted of "[c]riminal
17 mistreatment" of his daughters, who were removed from his custody
18 a year or two before the ALJ hearing. (A.R. 512-13)

19     Loveless stated he is unable to do any kind of work.  He
20 stated, "I have issues with doing things certain ways, and
21 concentrating, remembering, keeping on task, and stuff. . . .  I'm
22 weak.  I don't have no energy.  I can hardly focus to do anything
23 anymore." (A.R. 513)  He stated he realized he had problems with
24 his ability to work after his third or fourth job. (*Id.*)

25     Loveless stated doctors had prescribed Seroquel, trazodone,
26 Paxil, and Zoloft for him, but he did not have money or insurance
27 to fill the prescriptions, so he was "just down to [the] Seroquel
28

32 - FINDINGS & RECOMMENDATION

1  and . . . trazodone, . . . taking little pieces of them just to
2  help [him] get through [his] days." (A.R. 513-14)

3      Loveless indicated he had been hospitalized at Salem Hospital
4  on a couple of occasions when he "was going really crazy," but he
5  could not specify when this occurred.[6]  (A.R. 514-15)

6      The ALJ asked Loveless why he had missed some of his doctors'
7  appointments. He responded, "I can't remember. I have a really
8  hard time remembering anything. If you tell me something now, I
9  could forget it in two minutes. It just depends where I'm at that
10 day." (A.R. 515)

11     The ALJ noted that in 2004, Loveless had told Dr. Fitzpatrick
12 he could do landscaping or construction work. Loveless stated he
13 can no longer do those jobs. (*Id.*)

14     Loveless stated regardless how much sleep he gets, he is
15 always tired. He takes naps almost every day, varying in length
16 from a few minutes to a couple of hours, with the average being
17 about an hour-and-a-half. (A.R. 517) He stated he has to take
18 naps because he's "wore out" and "tired," and his "body gets
19 aching, pain." (A.R. 531) He needs more rest on some days than
20 others, just depending on how he is feeling. (*Id.*) The ALJ asked
21 why Loveless failed to complete the MMPI II test. He replied, "I
22 was really tired. I need[ed] to sleep. I was getting really
23 angry. I couldn't . . . understand it. So, I had my girlfriend
24 start reading to me. And I couldn't . . . just stay there. I
25 couldn't do it no more. I had to get out of there. Doctor said

26

27

28     [6]No records from any hospitalization appear in the Record.

33 - FINDINGS & RECOMMENDATION

1  it'd take him a little while, and it took him way longer. . . .  I

2  couldn't do it no more."  (A.R. 517)

3      Loveless stated he began having hallucinations at age seven or

4  eight.  The hallucinations are both visual and auditory, and he

5  sees "[b]ad people."  (A.R. 517-18)  He was put on medication as a

6  teenager, when he "got in trouble."  (A.R. 518)  He stated the

7  voices say "[a]ll kinds of stuff" such as "I'm going to kill you,

8  I'm going to hurt you, you're going to die."  (*Id.*)  He sees

9  "things like people, dead people in trash cans, and on sidewalks

10 . . . and closets, and cabinets, blood dripping in the windows, and

11 just lots of bad stuff."  (A.R. 518-19)  The hallucinations occur

12 mostly at night, but sometimes during the day, as well - anytime he

13 is really tired.  (A.R. 519)  He has hallucinations several times

14 a week, at least.  Paxil helped him "not see as much, and it made

15 [him] have lots of energy, to where [he] could at least get out of

16 bed and be happy."  (*Id.*)

17     The ALJ noted that in December 2004, Loveless had told

18 "somebody" that he had visual hallucinations but no auditory ones.

19 Loveless stated he probably said that because he had been

20 embarrassed about the problem for a long time.  (A.R. 519-20)

21     Loveless drinks one or two alcoholic drinks on weekends.  He

22 stated he has never used alcohol heavily, and has never considered

23 himself to be an alcoholic.  He admitted that he used metham-

24 phetamine and marijuana in the past, but stated he has never liked

25 alcohol.  (A.R. 521-22)  His drug of choice was methamphetamine,

26 which he began using occasionally at age nine, and intravenously at

27 age thirteen.  He continued to use methamphetamine frequently until

28 2004, when he got clean.  He stayed clean until late 2006 or early

34 - FINDINGS & RECOMMENDATION

1  2007, when he had a single-use relapse.  (A.R. 522-26)  He has been
2  to drug treatment twice, once as an inpatient and once as an
3  outpatient.  (A.R. 526-27)  When he was diagnosed with hepatitis C,
4  he stopped using drugs intravenously.  (A.R. 532)

5      According to Loveless, his drug and alcohol use only affected
6  his work once, when he worked at the Skate Palace.  He "got fired
7  for being late and using drugs."  (A.R. 527)

8      Loveless stated he dresses himself, but sometimes he is too
9  tired to shave or shower.  He generally showers about twice a week.
10 Since August 2003, he has not done any household chores except
11 "little things here and there," like taking out the trash.  He has
12 not done any lawn mowing or yard work.  He and his girlfriend go to
13 the grocery store together once a month.  He sometimes attends
14 church, and until his children were removed from the home, he was
15 providing child care for the children.  He uses a computer
16 occasionally to play games, but he is "not very good at it" and
17 gets bored.  He used to drive occasionally (despite not having a
18 license) but stopped after he "got pulled over," and the
19 authorities took his girlfriend's car.  Since then, he uses public
20 transportation.  (A.R. 528-29, 532)  He is unable to pay bills,
21 write a check without assistance, or address an envelope.  (A.R.
22 533)  Most of Loveless's time is spent watching television and
23 eating.  (A.R. 532)  He sees his children when they visit on the
24 weekends with their mother.  (A.R. 533)

25     Loveless and his "ex" own a horse together.  The horse is
26 boarded at a facility that also cares for the horse.  Loveless took
27 care of the horse "about two years [earlier]," before they started
28 boarding the horse at the facility.  He stated the horse is his

35 - FINDINGS & RECOMMENDATION

1    "seven-year-old's horse." (A.R. 530)   He sometimes goes out and

2    watches his daughter ride. (A.R. 533)

3        According to Loveless, he has been unable to work at any time

4    since August 2003.  He cannot work as a parking lot cashier because

5    he is unable to keep track of the money.  He cannot do an assembly

6    job because he "can't do things that like have directions." (*Id.*)

7    He has to have things shown to him, and then once he starts the

8    task, he gets bored quickly, gets distracted and tired, and then

9    gets angry. (A.R. 531)

10       Loveless stated that in addition to his mental problems, he

11   also has some physical problems.  He jumped off "a three-story

12   building" when he was seven and injured his lower back. (A.R. 533-

13   34)

14

15   *2.  Written Testimony*

16       On October 10, 2003, Loveless completed a questionnaire

17   regarding his activities of daily living and socialization. (A.R.

18   134-40)  He indicated he needs help washing his back and cutting

19   his hair.  Housework is done by his sister or his girlfriend.  He

20   helps by picking up his clothes or bringing dirty dishes to the

21   sink.  His girlfriend handles the money for the household, and the

22   two of them do the grocery shopping together.  He indicated his

23   ability to engage in activities, help around the house, and the

24   like has decreased since his disabling condition began.[7] (*Id.*)

25   Loveless's handwriting on the form is barely legible, and is

26   illegible in some places. (*See id.*)

27   _____

28       [7]These are curious observations in light of the fact that
     Loveless alleges he has been disabled since birth.

36 - FINDINGS & RECOMMENDATION

On a pain questionnaire completed on October 10, 2003, (A.R. 141-43), Loveless indicated he experiences severe stinging pain in his low back. He is in pain most of the time. Walking, riding in a car, and bending are painful for him. His statement of things that make the pain worse is illegible. (A.R. 141) Loveless estimated he can be up and active for half an hour before needing to rest. He occasionally takes walks, but can only walk about two blocks without resting. (A.R. 142-43) He can prepare his own meals, eating prepared or canned foods, and sometimes friends cook for him. His girlfriend does most of the household chores. If he goes out, someone else drives him. (A.R. 143)

Loveless completed a fatigue questionnaire on September 15, 2003. (A.R. 144-47) He indicated he first began experiencing fatigue in 1990. He naps daily for two to five hours. His fatigue causes him to "get too weak and tired." (A.R. 144) He has to sit down and rest between activities. He can be up for one to two hours before he needs to rest. He used to be able to run, lift, and exercise in the past, but he is not able to do these things any longer. (*Id.*) On this form, in contrast to the pain questionnaire, Loveless indicated he can walk "one mile" without resting. (A.R. 145) He grooms and bathes himself. He cleans his home, does laundry, and grocery shops once a month, but he needs help with cooking and shopping. He indicated that sometimes he is working and has to stop because he gets too tired or sick. When he goes out, he either takes public transportation or someone drives him. (*Id.*)

Loveless was unable to describe an "average day," because every day is different. He gets little sleep because he wakes up

37 - FINDINGS & RECOMMENDATION

1    and then is unable to return to sleep.  He listed his current
2    problems as back pain, and feeling "sad and angry and other mental
3    difficulties."  (A.R. 146)  At the time he completed the question-
4    naire, Loveless was not taking any medications, so he had no side
5    effects.  (A.R. 147)

6        Loveless estimated he can walk for one hour, stand for two
7    hours, and sit for one hour before resting.  He can bend, and reach
8    forward/upward frequently.  He can lift thirty pounds frequently.
9    (A.R. 146)

10

11                     ***E.  Third-Party Testimony***
12    **1.  Amber Breeze Wilson**

13        Loveless's sister, Amber Breeze Wilson, testified at the
14    second ALJ hearing.  She is three years older than Loveless.  (A.R.
15    559)  She has observed that Loveless has difficulty reading, and
16    she reads things for him.  She stated that although Loveless never
17    had a driver's license, he "used to drive before he got put back on
18    probation; but now, he . . . doesn't want to get into trouble, so
19    he stays away from driving."  (A.R. 557)  According to Wilson,
20    Loveless can use a computer to play some games, and he has learned
21    to use some programs.  (A.R. 558)

22        Wilson stated that, in her opinion, Loveless "has the
23    mentality . . . probably [of] about a 13-year-old."  (A.R. 560)
24    She has observed that he has problems getting along with people
25    because, in her opinion, people look down on him.  (*Id.*)

26        Wilson stated Loveless appears to be tired all the time.  On
27    some days, he will be awake for "about two hours out of the day,
28    and then, want to go back down because he's so tired."  (*Id.*)  On

38 - FINDINGS & RECOMMENDATION

1  other days, he might be awake for four hours.  (A.R. 561)  She

2  stated Loveless is "sad a lot, and wishes that he could do things

3  that other people can do, and he doesn't know why it has to be like

4  that."  (*Id.*)  In her opinion, Loveless is "very unhappy," "very

5  worried about things," and "very unreliable with a lot of things."

6  (A.R. 563)

7

8  **2.  *Jacqui M. Berger***

9        Loveless's girlfriend, Jacqui Berger, completed a Function

10 Report Adult - Third Party on October 10, 2003.  (A.R. 148-56)  The

11 photocopy of the form in the administrative transcript is poor,

12 making most of her handwritten notes illegible.

13       Berger indicated she spent most of the day with Loveless, and

14 they would run errands and take care of their children.  She

15 indicated Loveless was "Homeless," and lived alone.  (A.R. 148)

16 Her description of his daily activities is illegible.  (*See id.*)

17 She stated Loveless wakes up at night due to his back pain.  She

18 indicated he is unable to wash his hair without assistance.  (A.R.

19 149)

20       According to Berger, Loveless needs reminders to take his

21 medications - a curious observation when Loveless indicated, on

22 forms completed the same day, that he was taking no medications.

23 (A.R. 150)  She indicated he took medication "every day."  (A.R.

24 154)  She stated Loveless has little energy, and he can only spend

25 about five minutes at a time doing light chores such as picking up

26 his clothes or wiping the countertops.  He goes outside almost

27 every day, and he is able to go out alone.  He does not pay bills,

28 handle a bank account, write checks, or count change.  (A.R. 151)

39 - FINDINGS & RECOMMENDATION

1     According to Berger, Loveless has problems getting along with
2 other people. (A.R. 152; written comment illegible) She stated
3 Loveless has pain problems with all types of postural activities,
4 as well as problems concentrating, understanding, following
5 instructions, and completing tasks. She opined he could walk
6 "about 2-3 blocks" before needing to rest for thirty to sixty
7 minutes. She stated Loveless cannot pay attention for very long,
8 and sometimes he is unable to finish what he starts. Berger's
9 comments regarding how well Loveless can follow written and spoken
10 instructions are illegible. (A.R. 153) According to Berger,
11 Loveless does not handle stress or changes in routine well, and he
12 exhibits anger towards people. However, to her knowledge, he has
13 never been fired or laid off from a job because of problems getting
14 along with other people. (A.R. 154)

15

16     ***III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF***
17               ***A.  Legal Standards***

18     A claimant is disabled if he or she is unable to "engage in
19 any substantial gainful activity by reason of any medically
20 determinable physical or mental impairment which . . . has lasted
21 or can be expected to last for a continuous period of not less than
22 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

23     "Social Security Regulations set out a five-step sequential
24 process for determining whether an applicant is disabled within the
25 meaning of the Social Security Act." *Keyser v. Commissioner*, 648
26 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520). The
27 Keyser court described the five steps in the process as follows:

28

40 - FINDINGS & RECOMMENDATION

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)). The claimant bears the burden of proof for the first four steps in the process. If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not

41 - FINDINGS & RECOMMENDATION

1  disabled.  *Bustamante*,  262  F.3d  at  954  (citing  20  C.F.R.

2  §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

3      The ALJ determines the credibility of the medical testimony

4  and also resolves any conflicts in the evidence.  *Batson v. Comm'r*

5  *of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing

6  *Matney  v.  Sullivan*,  981  F.2d  1016,  1019  (9th  Cir.  1992)).

7  Ordinarily,  the ALJ  must  give  greater  weight  to  the opinions  of

8  treating physicians, but the ALJ may disregard treating physicians'

9  opinions where they are "conclusory, brief, and unsupported by the

10 record as a whole, . . . or by objective medical findings."  *Id.*

11 (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149

12 (9th Cir. 2001)).   If the ALJ disregards a treating physician's

13 opinions,  "'the ALJ  must  give  specific,  legitimate  reasons'"  for

14 doing so.  *Id.* (quoting *Matney*).

15     The ALJ also determines the credibility of the claimant's

16 testimony regarding his or her symptoms:

17          In deciding whether to admit a claimant's
            subjective symptom testimony, the ALJ must
18          engage in a two-step analysis.  *Smolen v.*
            *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
19          Under the first step prescribed by *Smolen*,
            . . . the claimant must produce objective
20          medical evidence of underlying "impairment,"
            and must show that the impairment, or a combi-
21          nation of impairments, "could reasonably be
            expected to produce pain or other symptoms."
22          *Id.* at 1281-82.  If this . . . test is satis-
            fied, and if the ALJ's credibility analysis of
23          the claimant's testimony shows no malingering,
            then the ALJ may reject the claimant's testi-
24          mony about severity of symptoms [only] with
            "specific findings stating clear and con-
25          vincing reasons for doing so."  *Id.* at 1284.

26 *Batson*, 359 F.3d at 1196.

27 / / /

28 / / /

42 - FINDINGS & RECOMMENDATION

1            **B.  *The ALJ's Decision***

2        The ALJ found Loveless had met the insured status requirements

3   of sections 216(i) and 223 of the Social Security Act through

4   December 31, 2005.  (A.R. 23, 25)  Loveless therefore must

5   establish that he was disabled on or before that date in order to

6   be entitled to benefits.  (*See* A.R. 23)

7        The ALJ found Loveless engaged in substantial gainful activity

8   ("SGA") for a portion of the time since his alleged onset date of

9   July 20, 1982.  Specifically, she found Loveless had worked at the

10  SGA level as a yard worker during 2002 and 2003, earning $4,168 and

11  $6,358, respectively.  The ALJ noted Loveless had stopped doing

12  yard work "because of licensing requirements," rather than due to

13  disability-related issues, "so the work cannot be considered an

14  unsuccessful work attempt."  (*Id.*)  The ALJ disbelieved Loveless's

15  claim that "he overestimated his earnings to the Internal Revenue

16  Service and paid more taxes than he should[.]"  (*Id.*)  She found

17  this to be unlikely, noting it would not have been in Loveless's

18  best interest to overestimate his income.

19       The ALJ found Loveless has severe impairments consisting of

20  "borderline intellectual functioning, a history of drug addiction

21  and alcohol abuse, and a depressive disorder."  (A.R. 26)  She

22  found Loveless "has no severe physical impairments," specifically

23  noting that his alleged leg and back pain and hepatitis C do not

24  cause more than a minimal limitation in his ability to work.  (*Id.*)

25  She further found that Loveless's impairments, singly or in

26  combination, do not meet or equal an impairment listed in the

27  regulations.  (*Id.*)

28

43 - FINDINGS & RECOMMENDATION

1    The ALJ found Loveless's mental impairments do not meet the
2  requirements of Listings 12.04, 12.05, or 12.09, nor do the
3  impairments satisfy the "paragraph B" criteria of Listings 12.04
4  and 12.09, and the "paragraph D" criteria of Listing 12.05.
5  Satisfaction of those criteria includes "at least two of the
6  following: marked restriction of activities of daily living; marked
7  difficulties in maintaining social functioning; marked difficulties
8  of maintaining concentration, persistence, or pace; or repeated
9  episodes of decompensation, each of extended duration . . .
10 mean[ing] three episodes within 1 year, or an average of once every
11 4 months, each lasting for at least 2 weeks." (A.R. 27)

12   The ALJ disagreed with that portion of the ME's opinion where
13 the ME testified Loveless's "multiple, intermittent relapses into
14 drug abuse constituted a 'continuous' episode of decompensation."
15 (A.R. 27, n.1)  The ALJ found the evidence to be "unclear as to
16 when and how often [Loveless] relapsed into drug abuse[.]"  (*Id.*)
17 She also noted there were no records indicating Loveless ever was
18 hospitalized, "even overnight - or otherwise acutely treated for
19 his drug abuse."  (*Id.*)  She therefore found Loveless had not
20 experienced any "extended episodes of decompensation as a result of
21 his severe, medically determinable mental impairments."  (*Id.*)

22   The ALJ found Loveless has mild limitations with regard to his
23 activities of daily living; "some difficulty with socializing";
24 "mild limitations regarding concentration, persistence and pace";
25 and "some difficulty with judgment and adapting to changes but [the
26 ability to] do simple tasks." (A.R. 27)  She noted Loveless had
27 worked at the SGA level, and also had done some household chores
28 and babysitting.  Reflecting these limitations, and after con-

44 - FINDINGS & RECOMMENDATION

1  sideration of the record as a whole, the ALJ found Loveless "has
2  the residual functional capacity to lift and carry fifty pounds
3  occasionally and twenty-five pounds frequently.  During an eight-
4  hour day, he can sit without limits, and stand or walk for two
5  hours at a time without limits.  In addition, [he] is restricted to
6  simple, routine, repetitive work, involving only minimal inter-
7  action with his supervisors, and occasional interaction with his
8  co-workers and the general public."  (A.R. 28)

9      The ALJ found Loveless's allegations regarding the severity of
10 his symptoms to be supported only partially by the record.  She
11 noted that "his allegations of being tired have been taken into
12 account in determining that he is able to lift 50 pounds (rather
13 than more) occasionally."  (A.R. 29)  She noted Loveless has
14 received only minimal treatment for his allegedly disabling
15 symptoms, and the treatment "has been essentially routine and
16 conservative in nature, and . . . generally successful in
17 controlling [his] symptoms."  (*Id.*)  In addition, the ALJ noted
18 Loveless often had missed scheduled appointments "and failed to
19 comply with the medical regimen prescribed by his treating doctors,
20 which suggests that his symptoms have not . . . been as serious as
21 has been alleged[.]"  (A.R. 29-30)

22     The ALJ also found Loveless's activities of daily living to be
23 more extensive and independent than one would expect, given
24 Loveless's complaints of disabling symptoms and limitations.  (A.R.
25 30)  The ALJ observed that although Loveless "was reasonably
26 articulate and appeared to be cognitively intact" during the
27 hearing, "he was a poor historian, and hesitated before answering
28 some questions and required prompting for details."  (*Id.*)  She

45 - FINDINGS & RECOMMENDATION

found his responses to be "evasive or vague at times," leaving the impression that Loveless "was not always entirely candid."   In addition, the ME testified Loveless's TOMM test scores were below expectations and "reflected he was not putting fourth [sic] his best efforts."  (*Id.*)

Regarding the testimony of Amber Wilson, the ALJ credited her testimony that Loveless "has problems with social maturity." (*Id.*) She noted Wilson's testimony indicated Loveless "has engaged in a number of activities and is still young.  However, social imma- turity is not recognized as a disabling condition." (*Id.*) Noting Wilson is not a medical or vocational expert, the ALJ found her overall testimony to be "of limited value in establishing [Loveless's] residual functional capacity, or determining how [his] impairments affect his overall ability to perform basic work activities." (*Id.*)

Regarding the third-party statement from Loveless's girl- friend, Jacqui Berger, the ALJ found the statement to contain ambiguities and statements inconsistent with the other record evidence.  She therefore did not give full weight to the statement as a whole.  (A.R. 31)

The ALJ gave significant weight to the opinions of Dr. Davis and Dr. Kruger, both of which would suggest Loveless is not totally disabled from working.  She also gave significant weight to the functional assessment performed by Dr. Hadden, who opined Loveless could work full time and would be an appropriate candidate for vocational rehabilitation.  (*Id.*)

The ALJ found Dr. Hotan's opinion regarding Loveless's functional abilities to be inconsistent with other substantial

46 - FINDINGS & RECOMMENDATION

1  evidence in the record, and unsupported by clinical and diagnostic
2  studies.   She noted that although "Dr. Hotan's opinions deserve
3  serious consideration" because she has been Loveless's treating
4  physician for a period of time, the doctor, herself, "explicitly
5  indicate[d] in her opinion [that] she relied exclusively on the
6  subjective report of symptoms and limitations provided by
7  [Loveless]." (A.R. 31-32)  For these reasons, the ALJ did not give
8  Dr. Hotan's opinion any significant weight. (*Id.*)

9      The ALJ concluded that her assessment of Loveless's residual
10 functional capacity was "consistent with the record as a whole,
11 including evidence regarding [his] daily activities and the
12 objective medical evidence[.]"  (A.R. 32)  Based on her RFC
13 assessment and the VE's testimony, the ALJ found Loveless is
14 capable of performing his past relevant work as a yard worker and
15 a kitchen helper.  She further found that even if Loveless were
16 incapable of performing his past relevant work, he could make a
17 successful adjustment to both of those jobs, even with Loveless's
18 limited reading, writing, and math abilities.   (A.R.  33)
19 Accordingly, the ALJ concluded Loveless "has not been under a
20 disability . . . from July 20, 1982[,] through the date of [her]
21 decision [i.e., September 23, 2008]." (A.R. 34)

22

23              *IV.   STANDARD OF REVIEW*

24      The court may set aside a denial of benefits only if the
25 Commissioner's findings are "'not supported by substantial evidence
26 or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.
27 Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.
28 Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*

47 - FINDINGS & RECOMMENDATION

1  *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
2  (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
3  mere scintilla but less than a preponderance; it is such relevant
4  evidence as a reasonable mind might accept as adequate to support
5  a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
6  1039 (9th Cir. 1995)).

7       The court "cannot affirm the Commissioner's decision 'simply
8  by isolating a specific quantum of supporting evidence.'"  *Holohan*
9  *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
10 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
11 must consider the entire record, weighing both the evidence that
12 supports the Commissioner's conclusions, and the evidence that
13 detracts from those conclusions.  *Id.*  However, if the evidence as
14 a whole can support more than one rational interpretation, the
15 ALJ's decision must be upheld; the court may not substitute its
16 judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
17 *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

18
19                        ***V.   DISCUSSION***
20                   ***A.   Substantial Gainful Activity***

21      Loveless first argues the ALJ erred in finding that he engaged
22 in substantial gainful activity ("SGA") in 2002 and 2003.  Dkt.
23 #15, ECF p. 18.  The Commissioner agrees the ALJ's analysis was
24 flawed, but he argues the error was harmless because the ALJ did
25 not deny Loveless's applications at step one of the sequential
26 analysis, but instead proceeded with the remainder of the analysis,
27 finding Loveless not disabled at steps four and five.  Dkt. #16,
28 ECF pp. 14-15.  In reply, Loveless argues the error "would, indeed,

48 - FINDINGS & RECOMMENDATION

1  be harmless" if it were the only error made by the ALJ, "but it is

2  not the only error."  Dkt. #17, ECF p. 4.

3       The ALJ's finding that Loveless worked at the SGA level was

4  considered by the ALJ as a factor in her determination that

5  Loveless "has had mild limits regarding daily activities."  (A.R.

6  27)  Other substantial evidence in the record supports the conclu-

7  sion that Loveless experiences only mild limitations in the area of

8  his daily activities.  To that extent, the court finds the error

9  was, in fact, harmless.

10      However, the determination that Loveless performed work at the

11 SGA level since his alleged onset date also was used in estab-

12 lishing Loveless's insured status for purposes of DI benefits, and

13 in calculating the date his insured status expired, which the ALJ

14 found to be December 31, 2005.  (A.R. 23, 25)  As the Commissioner

15 notes in his brief, if, as Loveless claims, he did not work at the

16 SGA level in either or both of 2002 and 2003, then he either might

17 not be insured for DI benefits at all, or, at the least, his date

18 last insured would be different.  *See* Dkt. #16, ECF p. 14, n.1.

19 The record evidence is insufficient to make this determination.

20 Therefore, if Loveless is found to be disabled, the error would not

21 be harmless with regard to the determination of his entitlement to

22 DI benefits[8], and to the date such entitlement ceased.  *See* 20

23 C.F.R. § 404.130 *et seq.*  Because, as discussed below, the court

24 has found this case should be remanded to correct other errors,

25 upon remand the ALJ should be directed to clarify Loveless's

26

27      [8]As the Commissioner further notes, a claimant's insured

28 status is not a factor in determining entitlement to SSI benefits
   under Title XVI of the Social Security Act.

49 - FINDINGS & RECOMMENDATION

1 earnings for 2002 and 2003 (to the extent possible), to make a
2 proper determination as to whether he worked at the SGA level
3 during those years, and, if not, to clarify whether he is entitled
4 to DI benefits at all and the date, if applicable, that his insured
5 status expired.

6

7 **B.  *Evaluation of Listed Impairments***

8    Loveless argues the ALJ erred in failing to perform an
9 assessment of the "B" criteria in accordance with the applicable
10 regulations.[9]  Dkt. #15, ECF pp. 20-24.  He also argues the ALJ
11 erred in failing to assess properly whether his borderline
12 intellectual functioning meets or equals the requirements of
13 Listing 12.05(C).  *Id.*, ECF pp. 18-24.

14    The Listing of Impairments (commonly referred to as the
15 "Listings") appears in Appendix 1 to Subpart P of 20 C.F.R. Part
16 404.  The Listings in section 12.00, govern the evaluation of a
17 disability on the basis of a mental disorder.  The Listings for
18 mental disorders are arranged in nine diagnostic categories.  The
19 regulations explain how the information in the Listings is
20 organized and applied, as follows:

21        Each listing except 12.05 and 12.09 consists
22        of a statement describing the disorder(s)
         addressed by the listing, paragraph A criteria
         (a set of medical findings), and paragraph B
23        criteria (a set of impairment-related func-
         tional limitations).  There are additional
24        functional criteria (paragraph C criteria) in
         12.02, 12.03, 12.04, and 12.06. . . . We will
25        assess the paragraph B criteria before we
         apply the paragraph C criteria.  We will
26        assess the paragraph C criteria only if we

27 _____

28    [9]*See* 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00 (discussed
   *infra* in § V.B.).

1       find that the paragraph B criteria are not
        satisfied.  We will find that you have a
2       listed impairment if the diagnostic descrip-
        tion in the introductory paragraph and the
3       criteria of both paragraphs A and B (or A and
        C, when appropriate) of the listed impairment
4       are satisfied.

5       The criteria in paragraph A substantiate medi-
        cally the presence of a particular mental
6       disorder.  Specific symptoms, signs, and
        laboratory findings in the paragraph A cri-
7       teria of any of the listings in this section
        cannot be considered in isolation from the
8       description of the mental disorder contained
        at the beginning of each listing category.
9       Impairments should be analyzed or reviewed
        under the mental category(ies) indicated by
10      the medical findings. . . .

11      The criteria in paragraphs B and C describe
        impairment-related functional limitations that
12      are incompatible with the ability to do any
        gainful activity.  The functional limitations
13      in paragraphs B and C must be the result of
        the mental disorder described in the diag-
14      nostic description, that is manifested by the
        medical findings in paragraph A.

15

16  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).

17      One of the Listings at issue in this case is 12.05, Mental

18  Retardation.  As noted in the introductory explanation quoted

19  above, the regulations treat this Listing differently from other

20  mental disorders:

21      The structure of the listing for mental
        retardation (12.05) is different from that of
22      the other mental disorders.  Listing 12.05
        contains an introductory paragraph with the
23      diagnostic description for mental retardation.
        It also contains four sets of criteria (para-
24      graphs A through D).  If your impairment
        satisfies the diagnostic description in the
25      introductory paragraph and any one of the four
        sets of criteria, we will find that your
26      impairment meets the listing.  Paragraphs A
        and B contain criteria that describe disorders
27      we consider severe enough to prevent your
        doing any gainful activity without any
28      additional assessment of functional limita-

51 - FINDINGS & RECOMMENDATION

1    tions.  For paragraph C, we will assess the
2    degree of functional limitation the additional
     impairment(s) imposes to determine if it sig-
3    nificantly limits your physical or mental
     ability to do basic work activities, i.e., is
4    a "severe" impairment(s), as defined in
     §§ 404.1520(c) and 416.920(c).  If the addi-
5    tional impairment(s) does not cause limita-
     tions that are "severe" as defined in [those
6    sections], we will not find that the
     additional impairment(s) impose "an additional
7    and significant work-related limitation of
     function," even if you are unable to do your
8    past work because of the unique features of
     that work.  Paragraph D contains the same
9    functional criteria that are required under
     paragraph B of the other mental disorders
     listings.

10

11   *Id.*

12      Loveless specifically challenges the ALJ's assessment of the
13   severity of his mental impairments under the first three of the
14   four "B" criteria (the "D" criteria under Listing 12.05); i.e.,
15   "Activities of daily living; social functioning; [and] concen-
16   tration, persistence, or pace[.]"[10]  *Id.*, § 12.00(C).  The ALJ noted
17   that to satisfy these criteria, "the mental impairments must result
18   in at least two of the following: marked restriction of activities
19   of daily living; marked difficulties in maintaining social func-
20   tioning; marked difficulties in maintaining concentration, persis-
21   tence, or pace; or repeated episodes of decompensation, each of
22   extended duration.  A marked limitation means more than moderate
23   but less than extreme."  A.R. 27.

24

25

26   _____

27      [10]Loveless does not challenge the ALJ's finding that he has not
     experienced any "extended episodes of decompensation as a result of
28   his severe, medically determinable mental impairments."  (A.R. 27,
     n.1)

52 - FINDINGS & RECOMMENDATION

Loveless argues the ALJ failed to conduct a proper assessment under each of the first three criteria. Therefore, the court will examine the regulatory description of each criterion before considering each of Loveless's arguments. The court then will consider whether the ALJ erred in failing to assess whether Loveless's borderline intellectual functioning meets the criteria of Listing 12.05(C).

## 1. *Activities of daily living*

The first of the four "B" criteria requires an assessment of the claimant's ability to perform activities of daily living.

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.
>
> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

*Id.*, § 12.00(B)(1).

The ALJ found Loveless "has had mild limits regarding daily activities." A.R. 27. She noted Loveless worked at the substan-

53 - FINDINGS & RECOMMENDATION

1 tial gainful activity level for part of the time since his alleged
2 onset date (a finding Loveless has challenged, as discussed above).
3 "He has looked for work; he has done chores such as vacuuming and
4 laundry.  He also has gone to church, used the computer, drove
5 [sic] and used public transportation at times." (*Id.*)   Loveless
6 argues the ALJ overlooked the fact that although he drove, "he has
7 never had a driver's license"; although he worked, "he has been
8 fired from nearly every job he has ever had"; and although he has
9 performed some household chores, those undertakings were "limited
10 and sporadic," and required varying amounts of rest for him to
11 complete. Dkt. #15, ECF p. 21 (citing *Fair v. Bowen*, 885 F.2d 597,
12 603 (9th Cir. 1989) (noting "many home activities are not easily
13 transferable to what may be the more grueling environment of the
14 workplace, where it might be impossible to periodically rest").
15 Loveless further asserts the ALJ overlooked the fact that he is
16 unable to pay bills, address and mail a letter, or shop alone for
17 more than one or two items, and he needs frequent reminders.  *Id.*

18     The Commissioner notes Dr. Hennings found Loveless to be only
19 mildly limited in his activities of daily living, and Dr. Hart
20 testified Loveless had only "relatively mild" limitations in his
21 daily activities.  Dkt. #16, ACF p. 22.  Dr. Kruger also found
22 Loveless capable of performing his daily activities adequately on
23 a routine basis.

24     Although the record contains evidence, such as that cited by
25 Loveless, that could be interpreted more favorably to him, the
26 record also indicates Loveless copes with most daily activities
27 with only a minimum of difficulty.  The court "'must uphold the
28 ALJ's decision where the evidence is susceptible to more than one

54 - FINDINGS & RECOMMENDATION

1  rational interpretation.'" *Burch v. Barnhart*, 400 F.3d 676, 680-81

2  (9th Cir. 2005) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 750

3  (9th Cir. 1989)).  The ALJ's finding regarding Loveless's degree of

4  limitation with regard to his daily activities is supported by the

5  medical evidence of record and by Loveless's own testimony

6  regarding his daily activities.

7

8  ***2.   Social functioning***

9       Regarding the second criterion, a claimant's social

10 functioning abilities, the regulations provide as follows:

11          Social functioning refers to your capacity to
            interact independently, appropriately, effec-
12          tively, and on a sustained basis with other
            individuals.  Social functioning includes the
13          ability to get along with others, such as
            family members, friends, neighbors, grocery
14          clerks, landlords, or bus drivers.  You may
            demonstrate impaired social functioning by,
15          for example, a history of altercations, evic-
            tions, firings, fear of strangers, avoidance
16          of interpersonal relationships, or social
            isolation.  You may exhibit strength in social
17          functioning by such things as your ability to
            initiate social contacts with others, commu-
18          nicate clearly with others, or interact and
            actively participate in group activities.  We
19          also need to consider cooperative behaviors,
            consideration for others, awareness of others'
20          feelings, and social maturity.  Social func-
            tioning in work situations may involve inter-
21          actions with the public, responding appropri-
            ately to persons in authority (e.g., super-
22          visors), or cooperative behaviors involving
            coworkers.

23
            We do not define "marked" by a specific number
24          of different behaviors in which social func-
            tioning is impaired, but by the nature and
25          overall degree of interference with function.
            For example, if you are highly antagonistic,
26          uncooperative, or hostile but are tolerated by
            local storekeepers, we may nevertheless find
27          that you have a marked limitation in social

28

55 - FINDINGS & RECOMMENDATION

1                     functioning because that behavior is not
2                     acceptable in other social contexts.

3 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2).

4      The ALJ found Loveless to have "moderate limitations" in his
5 social functioning ability. (A.R. 27) She noted Loveless has
6 friends, used to care for his children, and used to go to church
7 regularly. *Id.* She further noted Dr. Kruger had opined Loveless
8 "has some difficulty with socializing." (*Id.*) Dr. Hennings opined
9 Loveless would be able to accept criticism appropriately with a
10 "supportive supervisor" (A.R. 256), which is consistent with
11 Dr. Kruger's indication that Loveless would have moderate diffi-
12 culty interacting appropriately with supervisors. (A.R. 399)
13 These observations support the ALJ's conclusion that Loveless has
14 moderate limitations in his social functioning ability. However,
15 the totality of the evidence suggests a different result.

16      Loveless notes his sister testified that he is socially
17 immature, but the ALJ found "social immaturity is not recognized as
18 a disabling condition." (A.R. 30) Loveless is correct that this
19 observation was inappropriate; as noted in the quoted section
20 above, "social maturity" is a factor the Commissioner considers in
21 assessing a claimant's social functioning. In addition, a history
22 of repeatedly being fired from jobs is a factor in assessing social
23 functioning, and the record indicates Loveless was fired frequently
24 from the various jobs he has held. In addition, in noting Loveless
25 "took care of children," the ALJ failed to note or discuss the fact
26 that Loveless's children were removed from the home because he was
27 unable to care for them properly. These factors suggest Loveless's
28 limitations in social functioning are more than merely "moderate."

56 - FINDINGS & RECOMMENDATION

1    In discussing what constitutes a "marked" limitation, the
2  regulations require consideration of "the nature and overall degree
3  of interference with function." 20 C.F.R. pt. 404, subpt. P, app.
4  1, § 12.00(C)(2). The evidence of record indicates Loveless's
5  overall limitations in functioning in social contexts is "more than
6  moderate but less than extreme," (A.R. 27), which fits the
7  definition of a "marked" limitation cited by the ALJ. (*Id.*)
8  Although the record contains some evidence to support the ALJ's
9  conclusion that Loveless's social functioning ability is only
10 moderately limited, the evidence is not substantial. The court
11 therefore finds the ALJ's assessment of this "B" criterion did not
12 comport with the regulations and was erroneous.

13

14 *3.   Concentration, persistence, or pace*

15   The third "B" criterion is the individual's "ability to
16 sustain focused attention and concentration sufficiently long to
17 permit the timely and appropriate completion of tasks commonly
18 found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1,
19 § 12.00(C)(3). The regulations caution:

> We must exercise great care in reaching
> conclusions about your ability or inability to
> complete tasks under the stresses of employ-
> ment during a normal workday or work week
> based on a time-limited mental status examina-
> tion or psychological testing by a clinician,
> or based on your ability to complete tasks in
> other settings that are less demanding, highly
> structured, or more supportive. We must
> assess your ability to complete tasks by
> evaluating all the evidence, with an emphasis
> on how independently, appropriately, and
> effectively you are able to complete tasks on
> a sustained basis.
>
> We do not define "marked" by a specific number
> of tasks that you are unable to complete, but

57 - FINDINGS & RECOMMENDATION

1       by the nature and overall degree of inter-
      ference with function.  You may be able to
2       sustain attention and persist at simple tasks
      but may still have difficulty with complicated
3       tasks.  Deficiencies that are apparent only in
      performing complex procedures or tasks would
4       not satisfy the intent of this paragraph B
      criterion.  However, if you can complete many
5       simple tasks, we may nevertheless find that
      you have a marked limitation in concentration,
6       persistence, or pace if you cannot complete
      these tasks without extra supervision or
7       assistance, or in accordance with quality and
      accuracy standards, or at a consistent pace
8       without an unreasonable number and length of
      rest periods, or without undue interruptions
9       or distractions.

10 *Id.*

11     The ALJ found Loveless has only "mild limitations regarding

12 concentration, persistence and pace."  (A.R. 27)  She noted

13 Loveless had done household chores and babysitting, and, as above,

14 that he had worked at the SGA level.  (*Id.*)

15     As noted above, the Commissioner has agreed that the ALJ's

16 finding regarding Loveless's substantial gainful activity may be

17 erroneous.  The fact that Loveless was capable of earning a few

18 thousand dollars during a couple of years, by itself, is not

19 substantial evidence that he is capable of maintaining the degree

20 of concentration, persistence, and pace required for the day-in,

21 day-out routine of ongoing employment.  Substantial evidence in the

22 record suggests exactly the opposite.  The ALJ failed to give

23 proper consideration to the opinions of the medical consultants

24 that Loveless would experience some difficulty in performing even

25 simple, repetitive tasks (*see, e.g.*, A.R. 291, where Dr. Davis

26 noted Loveless's "performance on rote, repetitive tasks appeared in

27 the Deficient range, and showed an unusually high rate of errors"),

28

58 - FINDINGS & RECOMMENDATION

1  and to the evidence that despite numerous attempts to work,
2  Loveless has been unable to sustain long-term employment.

3      Nevertheless, although the record does not contain substantial
4  evidence to support the ALJ's conclusion that Loveless has only
5  "mild" limitations in concentration, persistence, and pace, neither
6  does the evidence support a finding that his limitations in this
7  area are "marked."  The court finds particularly troubling the
8  inconsistencies and vagueness in Loveless's testimony, and his TOMM
9  results that call his other test results into question.  In addi-
10 tion, conspicuous by its absence in this case is an up-to-date
11 functional evaluation by a vocational expert, jobs program, or
12 vocational rehabilitation specialist, that could provide important
13 insight into Loveless's actual ability to perform employment-
14 related tasks - even rote, repetitive tasks - on a consistent
15 basis.

16     In summary, the court finds the record is not fully developed
17 on the issue of Loveless's ability to maintain concentration,
18 persistence, and pace as required to sustain competitive
19 employment.  This deficiency in the record requires remand for
20 further development, including the obtaining of additional testing
21 or assessments as appropriate.

22

23 *4.*  **Listing 12.05(C)**

24     Loveless argues the ALJ failed to assess whether his
25 borderline intellectual functioning meets or equals Listing
26 12.05(C).  As discussed above, Listing 12.05, Mental Retardation,
27 is treated differently from the other mental disorders.  A
28 claimant's impairment must satisfy the introductory diagnostic

59 - FINDINGS & RECOMMENDATION

description of the Listing, as well as "any one of the four sets of criteria" set forth in paragraphs A through D.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).  Loveless specifically challenges the ALJ's failure to assess whether he meets or equals Listing 12.05(C), which would require that he meet the introductory diagnostic description of the Listing, and that he satisfy the criteria of paragraph C, as follows:

> 12.05  Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> .   .   .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of func-tion[.]

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

Loveless points to Dr. Kruger's IQ testing which showed a full-scale IQ of 70, verbal IQ of 74, and performance IQ of 72.  He notes the ME testified that these results could vary by four or five points either way, which could bring all three of the scores within the "60 through 70" range.  Dkt. #15, ECF pp. 18-19.  Of course, that might just as likely bring all three scores above 70. Loveless further argues the ALJ's finding that he has another severe mental impairment - "a depressive disorder" (A.R. 26) - satisfies Listing 12.05(C)'s requirement of an "other mental impairment imposing an additional and significant work-related

60 - FINDINGS & RECOMMENDATION

1  limitation of function." § 12.05(C); *see* Dkt. #15, ECF p. 19.
2  Loveless asserts the record evidence shows that his depressive
3  disorder has had more than a slight or minimal effect on his
4  ability to perform basic work activities, meeting the definition of
5  an impairment that imposes a significant work-related limitation of
6  function. *Id.* (citing *Fanning v. Bowen*, 827 F.2d 631, 6334 (9th
7  Cir. 1987)).

8      The Commissioner argues that contrary to Loveless's assertion,
9  the ALJ did, in fact, address Listing 12.05(C), by specifically
10 finding Loveless's "mental impairments do not meet or medically
11 equal the requirements of listings 12.04, 12.05 o4 12.09." (A.R.
12 27)   The ALJ noted, "In making this finding, [she] considered
13 whether the . . . 'paragraph D' criteria of listing 12.05 . . .
14 [had been] satisfied." (*Id.*)  The Commissioner asserts that simply
15 because the ALJ did not cite paragraph C of Listing 12.05,
16 specifically, does not mean she did not consider the paragraph C
17 requirements.  Dkt. #16, ECF p. 20 (citing *Gonzalez v. Sullivan*,
18 914 F.2d 1197, 1201 (9th Cir. 1990) ("It is unnecessary to require
19 the [Commissioner], as a matter of law, to state why a claimant
20 failed to satisfy every different section of the listing of
21 impairments.").   The Commissioner notes the ALJ discussed
22 Loveless's "IQ scores and other psychological testing" in her
23 decision, which adequately supported her conclusion that Loveless's
24 borderline intellectual functioning did not meet or equal the
25 requirements of Listing 12.05(C).  *Id.*  The Commissioner then
26 discusses various evidence in the record that could be construed as
27 supporting the ALJ's decision. *See id.*, ECF pp. 20-21.

28

61 - FINDINGS & RECOMMENDATION

1    Loveless responds that the Commissioner's discussion of the
2 evidence does nothing to cure the deficiency in the ALJ's decision.
3 He points to the regulatory requirement that the ALJ include in the
4 written decision an application of the Psychiatric Review Tech-
5 nique, actually "'comparing the medical findings about [the
6 claimant's] impairment(s) and the rating of the degree of func-
7 tional limitation to the criteria of the appropriate listed mental
8 disorder.'"    Dkt. #17, ECF p. 7 (quoting 20 C.F.R.
9 § 404.1520a(d)(2), and statements of the Social Security Admini-
10 stration upon promulgation of the regulations, 65 Fed. Reg. 50,746-
11 50,757 (Aug. 21, 2000)).

12    The ALJ specifically found that Loveless's borderline
13 intellectual functioning is a severe impairment. (A.R. 26) Having
14 so found, the regulations required the ALJ to determine whether the
15 impairment "meets or is equivalent in severity to a listed mental
16 disorder." 20 C.F.R. § 404.1520a(d)(2). This requires the ALJ's
17 opinion to include a discussion of "the pertinent findings and
18 conclusions required in the application of the [psychiatric review]
19 technique." 65 Fed. Reg. 50,746, 50,757 (Aug. 21, 2000); *see* 20
20 C.F.R. § 404.1520a(e).

21    "At the first two levels of review, this technique is
22 documented in a Psychiatric Review Technique form," but at the
23 hearing level, "the Commissioner must 'document application of the
24 technique in the decision.'" *Keyser v. Commissioner*, 648 F.3d 721,
25 725 (9th Cir. 2011) (quoting 20 C.F.R. § 404.1520a(e)). Failure to
26 do so is error and requires remand. *Keyser*, *passim*.

27    The ALJ discussed each of the four areas of functional
28 limitation, as noted above, and she noted Loveless's I.Q. scores as

62 - FINDINGS & RECOMMENDATION

found by Dr. Kruger. However, in light of the ME's testimony that Loveless's I.Q. scores could vary four or five points in either direction, together with Loveless's demonstrated difficulties completing the MMPI, and his questionable test results based on his scores on the TOMM test, the court finds the ALJ did not comply fully with the regulations in her discussion of whether Loveless's borderline intellectual functioning meets or is equivalent to Listing 12.05(C).

Other than Dr. Davis's observation, in March 2002, that Loveless could fit the eligibility category for mental retardation under certain conditions (A.R. 292), it does not appear that any mental health professional has offered an opinion on this issue. The two Psychiatric Review Techniques in the record, by Dr. LeBray and Dr. Hennings, failed to consider Listing 12.05 at all. The most recent Psychiatric Review Technique form, for the period from November 6, 2003, to May 18, 2005, reflects Dr. LeBray's opinion that the record contains insufficient evidence for a determination regarding the severity of Loveless's mental impairments. Dr. LeBray considered only Listing 12.04, Affective Disorders ("possible Bipolar/Mood" disorder, A.R. 275), without considering Listing 12.05. (A.R. 272-84) The previous form, completed by Dr. Hennings for the period from October 1, 2001, to October 3, 2003, similarly omits any consideration of Listing 12.05. (A.R. 257-71)

Having found Loveless's borderline intellectual functioning to be severe, the ALJ was required to follow the requirements of 20 C.F.R. § 404.1520a in determining whether the impairment meets or

63 - FINDINGS & RECOMMENDATION

1  equals Listing 12.05(C). Her failure to do so requires remand for
2  further proceedings on this issue, as well.

3

4              **C.  *Evaluation of Third-Party Testimony***

5      Loveless argues the ALJ erred in discrediting his sister's
6  testimony on the basis that his sister "'does not have medical or
7  vocational expertise[.]'" Dkt. #15, ECF p. 24 (quoting A.R. 30).
8  He argues it was improper for the ALJ to disregard his sister's
9  observations simply because she is not an expert. *Id.* (citing
10 *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993)).

11     The Commissioner notes the ALJ also gave a second reason for
12 discounting Ms. Wilson's testimony; i.e., the fact that Ms. Wilson
13 was "out of state between April 2003 and April 2007, and therefore
14 was not able to observe [Loveless] for a substantial portion of
15 time." A.R. 30. The Commissioner argues, therefore, that because
16 the ALJ gave a germane reason for rejecting Ms. Wilson's testimony,
17 the ALJ's statement regarding Ms. Wilson's lack of expertise was
18 harmless error. Dkt. #18, ECF p. 25 (citing *Carmickle v.*
19 *Commissioner*, 533 F.3d 1155, 1162-63 (9th Cir. 2008); *Valentine v.*
20 *Commissioner*, 574 F.3d 685, 694 (9th Cir. 2009)).

21     Loveless did not respond to the Commissioner's argument in his
22 reply brief. *See* Dkt. #17.

23     The court finds the ALJ did not err in rejecting Ms. Wilson's
24 testimony. The ALJ did not discount her testimony entirely; she
25 only failed to give the testimony "significant weight." A.R. 30.
26 Indeed, even if given full weight, Ms. Wilson's opinions would add
27 little to the analysis of Loveless's functional capacity.

28

64 - FINDINGS & RECOMMENDATION

### D. *Improper Legal Standard*

1   Loveless argues the ALJ applied an improper legal standard in
2 evaluating the evidence.  The ALJ found, "Considering the entire
3 case record, the claimant fails to convince the undersigned that he
4 is so impaired that he cannot perform any kind of gainful work."
5 (A.R. 30)  Loveless argues this statement does not articulate a
6 proper disability test, nor is "convincing" the ALJ the requisite
7 standard of proof.  Rather, he is required to show only that he is
8 unable to perform his past relevant work, and any other work that
9 exists in significant numbers in the national economy.  Dkt. #15,
10 ECF pp. 24-25 & n.7.

11   The Commissioner failed to address this argument in his brief.
12 *See* Dkt. #16.

13   Even if the ALJ's findings are supported by substantial
14 evidence, "the decision should be set aside if the proper legal
15 standards were not applied in weighing the evidence and making the
16 decision." *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968);
17 *accord Yahraes v. Barnhart*, 72 Fed. Appx. 598, 599-600 (9th Cir.
18 2003); *Frost v. Barnhart*, 314 F.3d 359, 367 (9th Cir. 2002); *Floyd
19 v. Finch*, 441 F.2d 73, 104 (6th Cir. 1971); *see also Barden v.
20 Richardson*, 336 F. Supp. 400, 401 (D. Idaho 1972) (relying on
21 *Flake*, court suggested the question of whether ALJ's decision is
22 supported by substantial evidence need not even be reached where
23 ALJ uses improper legal standard to determine whether claimant is
24 disabled).

25   In this case, the ALJ set forth the proper standard of review
26 at the beginning of her decision.  *See* A.R. 24-25.  It appears she
27 may simply have used unfortunate terminology in stating her

65 - FINDINGS & RECOMMENDATION

conclusion, rather than actually applying an improper legal standard. In any event, because the court has found numerous other bases for remanding the case, the court finds this issue to be moot.

### E.  Residual Functional Capacity

Loveless argues the ALJ improperly assessed his activities of daily living in relation to his residual functional capacity. He asserts that merely listing activities he is able to perform, without also discussing "how frequently, how well, and how independently they were performed, is not adequate for assessing capacities for sustaining a full-time work schedule." Dkt. #15, ECF p. 26.

The court rejects this argument. The court previously has found the ALJ's determination that Loveless has mild limitations on his activities of daily living was not erroneous. *See* § V.B.1., *supra*. A similar analysis applies here. The ALJ considered not only the list of activities Loveless performs regularly and without assistance; she also considered the opinions of three consultants, one of whom performed a complete mental status assessment of Loveless, and all three of whom found Loveless to have only mild limitations in his ability to perform his daily activities.

### F.  Loveless's Ability to Work

Loveless argues substantial evidence does not support the ALJ's determination that he has the residual functional capacity ("RFC") to work as a yard worker or kitchen helper. He particularly challenges the VE's testimony regarding these

66 - FINDINGS & RECOMMENDATION

1  occupations, arguing the VE used improper job classifications and
2  standards that conflict with the *Dictionary of Occupational Titles*
3  ("DOT").   Dkt. #15, ECF pp. 27-30.   The Commissioner disagrees.
4  Dkt. #16, ECF pp. 25-29.

5       The parties, in their briefs, engage in a spirited discussion
6  of the meaning and import of the DOT's specification of the level
7  of "reasoning development" required for the jobs of yard worker and
8  kitchen helper.   Both of these jobs, identified by the ALJ as work
9  Loveless could perform, specify a reasoning development level of 2,
10 which requires that a person be able to "[a]pply commonsense under-
11 standing to carry out detailed but uninvolved written or oral
12 instructions[,] [and] [d]eal with problems involving a few concrete
13 variables in or from standardized situations."   DOT App. C, § III
14 (available at http://www.occupationalinfo.org/appendxc_1.html#III).
15 Loveless seizes on the terms "detailed" and "written," arguing the
16 evidence shows he is incapable of understanding and carrying out
17 detailed written instructions.   He further argues he lacks the
18 ability to "deal with problems" on the job.   Dkt. #15, ECF pp. 28-
19 29.

20      Loveless asserts a reasoning level of 1 is more appropriately
21 applied to him; i.e., the ability to "[a]pply commonsense
22 understanding to carry out simple one- or two-step instructions[,]
23 [and] [d]eal with standardized situations with occasional or no
24 variables in or from these situations encountered on the job."   DOT
25 App. C, § III.   Loveless notes Dr. Davis found his performance on
26 rote, repetitive tasks to be deficient; Dr. Kruger indicated he has
27 only a "fair" ability to sustain attention on "brief, basic,
28 routine, repetitive tasks," and he would have difficulty with any

67 - FINDINGS & RECOMMENDATION

1  details that were not "basic and repetitive" (A.R. 404); and
2  Dr. Hennings found he could only "carry out short and simple
3  instructions and less complex learned by rote, . . . [and] make
4  simple decisions" (A.R. 256).

5       The Commissioner takes a different tack, arguing the DOT's
6  reasoning levels are only one of three vocational factors (the
7  other two being age and work experience) considered by an ALJ,
8  together with a claimant's RFC, in determining whether a claimant
9  can work at step five of the sequential evaluation process. Dkt.
10 #16, ECF p. 26. The Commissioner argues Loveless is confusing "the
11 vocational factor of education with the RFC, contrary to the
12 Commissioner's regulatory scheme." *Id.*, ECF p. 27. The Commis-
13 sioner further argues the DOT's "generic description" of the
14 reasoning level required for a particular job is not required to be
15 consistent with the RFC as determined by the ALJ. *Id.*, ECF pp. 28-
16 29.

17      Although the parties' arguments raise interesting questions in
18 an abstract, academic sense, they are irrelevant here, where the
19 court has found the record not to be developed fully, requiring the
20 ALJ's findings to be redone on an appropriately-developed record
21 with respect to Loveless's ability to work. Moreover, the court
22 finds the ALJ erred in relying on the VE's testimony without
23 identifying information in the record that supports the VE's
24 apparent deviation from the express language of the DOT. *See*
25 *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995) ("We make
26 explicit here that an ALJ may rely on expert testimony which
27 contradicts the DOT, but only insofar as the record contains
28 persuasive evidence to support the deviation."). The fact that

Loveless objected to the VE's testimony deserved at least brief
discussion in the ALJ's decision in order for the ALJ to rely on
the VE's opinion regarding jobs Loveless is capable of performing.
*Cf. Massachi v. Astrue*, 486 F.3d 1149, 1152-54 (9th Cir. 2007)
(discussing ALJ's "affirmative responsibility" to question VE about
any possible conflicts between VE's evidence and information
provided in the DOT).

### G.  Step Five Burden

Loveless argues the Commissioner cannot sustain his burden at
step five of the sequential evaluation process, to show he is able
to work.  He argues this case should be remanded for an award of
benefits without further proceedings because "it is clear from the
administrative record" that he is entitled to benefits.  Dkt. #15,
ECF p. 30.

The Commissioner argues that even if the ALJ committed
reversible error, the record does not establish clearly that
Loveless is entitled to benefits, and the proper remedy is remand
for further proceedings.  Dkt. #16, ECF pp. 29-30.  The court
agrees with the Commissioner.  The current record is incomplete and
the unresolved issues too many for the court to award benefits at
this juncture.

### VI.  CONCLUSION

For the reasons discussed above, the undersigned recommends
the Commissioner's decision be **reversed**, and this case be **remanded
for further proceedings** consistent with this opinion.

69 - FINDINGS & RECOMMENDATION

1                          ***VII.   SCHEDULING ORDER***

2          These Findings and Recommendations will be referred to a

3    district judge.  Objections, if any, are due by **February 10, 2012.**

4    If no objections are filed, then the Findings and Recommendations

5    will go under advisement on that date.  If objections are filed,

6    then any response is due by **February 27, 2012.**  By the earlier of

7    the response due date or the date a response is filed, the Findings

8    and Recommendations will go under advisement.

9          IT IS SO ORDERED.

10                         Dated this 23rd day of January, 2012.

11

12                         /s/ Dennis J. Hubel

13                         _____
                           Dennis James Hubel
14                         Unites States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

70 - FINDINGS & RECOMMENDATION